**Dennis A. HERMAN, Plaintiff,**

v.

**T & S COMMODITIES, INC. and Robert Sherman, Defendants.**

82 CIV 4855 (LBS).

United States District Court, S.D. New York.

June 29, 1984.

Schulte Roth & Zabel, New York City, for plaintiff; David M. Brodsky, E. Scott Gilbert, New York City, of counsel.

Baer, Marks & Upham, New York City, for defendants; Barry J. Mandel, Allan Dinkoff, New York City, of counsel.

## OPINION

SAND, District Judge.

Plaintiff, Dennis Herman, was an investor in commodities with defendant, T. & S. Commodities, Inc. ("T & S"), a futures commission merchant and member of the Commodity Exchange, Inc. or "Comex." Co-Defendant Robert Sherman formerly worked for T & S as Vice-President in charge of operations. In June of 1982, plaintiff, assisted by Sherman, established a commodities trading account at T & S. Shortly thereafter, Sherman executed various trades for this account, a number of which were concededly unauthorized. Plaintiff now seeks damages under Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, for allegedly material misrepresentations, omissions, and unauthorized and unratified trading made by defendants in plaintiff's account. Plaintiff also asserts these claims under a common law fraud theory, seeking compensatory and punitive damages. Defendant T & S seeks recovery of the $90,110. debit balance remaining in plaintiff's account. By memorandum endorsement, on December 3, 1982, we denied defendants' motion to strike plaintiff's claim for lost profits under the Commodity Exchange Act; and on September 15, 1983, we denied defendants' motion for summary judgment. 578 F.Supp. 601. The pleadings were amended by the parties' joint pretrial order of April 5, 1984 and a bench trial was held on April 6, April 20, April 23 and 24, 1984. Post-trial briefs were submitted on May 11 and May 24, 1984. The following constitutes the Court's findings of fact and conclusions of law under F.R. Civ.P. 52.

## FINDINGS OF FACT

### Dennis Herman

Plaintiff is 38 years old and is president of American Federal Group, Ltd., a broker, underwriter, and agent for various insur-

ance companies. Plaintiff attended college for two years and then went to insurance school to get a property and casualty license. Since that time, plaintiff has enjoyed a successful career in the insurance industry. He worked at John Hancock Mutual Life Insurance Company until 1972, attaining the position of Vice-President of Marketing and Sales. He then left John Hancock to form his own firm, Executive Brokerage Associates, which was merged with another company in 1978–79 to become American Federal Group. Plaintiff's business has grown appreciably since 1978. He has a net worth of over one million dollars, and had nearly one million dollars invested in stocks, bonds, and commodities before he met Robert Sherman.

### Herman's Investment Experience

Plaintiff's investment history prior to June 1982, is well documented and set forth in the joint pretrial order of April 5, 1984. Since January 1978, plaintiff maintained an account at A.G. Becker, Inc. in which he bought and sold primarily publicly traded securities. The market value of this account has averaged in excess of $200,000 since January 1980.

Plaintiff also had an account at Bache, Halsey, Stuart, Shields, Inc., established in October 1978, through which plaintiff bought and sold primarily tax exempt municipal bonds. Since September 1981, the market value of such bonds in plaintiff's account at Bache averaged in excess of $350,000.

Plaintiff's brokers at both A.G. Becker and Bache testified during the trial. Jeffrey Nash, plaintiff's high school friend, handled plaintiff's account at A.G. Becker. According to Mr. Nash, "Mr. Herman's objectives were to go for capital gains, certainly in excess of anything that we could earn in interest bearing or very secure interest bearing type securities and to do it, if possible, in a long term fashion." Trial Transcript ("Tr.") p. 323. Nash had no discretionary authority with respect to plaintiff's account. The vast majority of plaintiff's stock positions, however, were

purchased at Nash's recommendation. But plaintiff sometimes made his own stock selections and on a number of occasions rejected Nash's recommendations. Turnover in plaintiff's account at A.G. Becker was relatively light, involving in the twelve months ending May 28, 1982, approximately three sales of securities. On May 28, 1982, plaintiff's account at A.G. Becker revealed 14 securities positions.

Paul Sheldon was plaintiff's broker at Bache. According to Mr. Sheldon, all of Mr. Herman's municipal bond purchases in 1980 and 1981 and 6 of 9 stock purchases were made at Sheldon's recommendation.

In the latter part of 1981, plaintiff expressed an interest in the commodities market to Jeffrey Nash. Nash, concerned that neither he nor plaintiff possessed the requisite time or knowledge to manage a commodities account, recommended that plaintiff secure the services of Ken Hanger, a professional commodities manager at Becker, to run the account. In October 1981, plaintiff invested $50,000 in a commodities pool known as the Hanger fund. Plaintiff had no discretion over the fund's activities; as plaintiff explained "you commit that $50,000 for a one-year period and you have nothing to say about it, nor can you make recommendations—nor could I even get in touch with Mr. Hanger." Tr. p. 45.

In contrast to this experience at Becker was plaintiff's experience as a commodities investor with Bache. In November 1981, plaintiff began a series of significant commodities investments in the Bache account which were made, for the most part, without the counsel of investment advisors.

In that month, plaintiff purchased 15,000 ounces of physical silver at $8.15 an ounce. Plaintiff purchased an additional 15,000 ounces of silver in January 1982 at a price of $8.18 per ounce. According to plaintiff, he placed initial orders without the benefit of price consultation with brokers. *See* Tr. pp. 211–12. Mr. Sheldon testified that plaintiff "thought the price of silver was going to go up, and he wished to take advantage of the upward price move that he thought was coming in silver." Tr.

p. 348. It is apparent that plaintiff initiated the silver purchases on the basis of his belief that silver was underpriced at the time of the investments and would appreciate. Tr. p. 44, 349–50.

In March 1982, plaintiff invested in commodity futures contracts for the first time by purchasing 10 September 1982 silver "lots" at a price of $8.48 per ounce.[1]

The silver positions effected through plaintiff's account at Bache were liquidated at substantial losses in June of 1982. *See infra.*

Through his experiences in the commodities market, plaintiff became familiar with margin requirements and margin calls. For his futures position at Bache, plaintiff posted margin of $2,500 per contract. Because of significant losses in this account, additional monies required for margin were transferred, with plaintiff's knowledge and consent, from plaintiff's other account at Bache to plaintiff's commodities account. Tr. p. 188. No additional monies were required to sustain plaintiff's investment in the "Hanger" fund. *See* Tr. at 189 (discussing appreciation of Hanger investment).

Plaintiff's personal background and investment history as revealed through stipulations, testimony and exhibits received at trial, indicate that plaintiff was a relatively experienced, if not sophisticated, investor at the time he met defendant Sherman. Though he was losing money in commodities, he was conversant with the market, with its risks and potential rewards. His understanding is well summarized in the following exchange with defendants' counsel.

Q I think last time you testified that you had seen a risk disclosure statement prior to June 7 of 1982, isn't that correct?

A Yes, I had.

Q You had seen one of those in connection with either your account at Bache or the Hanger Group, isn't that correct?

A Yes.

Q As of June 7 you were aware, were you not, that you could lose money in the commodities market, is that right?

A Yes, I was.

Q You had some idea, did you not, as to how much you could lose in the commodities market, didn't you?

A I had recently sustained a large loss. I knew that I could lose money in the commodities market, yes.

Q The large loss of which you are speaking is approximately $200,000, is that correct?

A That's correct.

Q And you were aware as of June 7, 1982, that if the market went against you, there might be a need for additional margin to be put up, isn't that correct?

\* \* \* \* \* \*

THE WITNESS: Yes.

Q You also understood by June 7 of 1982 that an investment in commodities futures transaction was a form of leverage, isn't that correct?

A To a certain extent, yes.

Q That was one of the reasons you had purchased futures contracts at Bache, wasn't it?

A That's right.

\* \* \* \* \* \*

Tr. pp. 207–09.

To say that plaintiff was relatively experienced is not to say that plaintiff was an intelligent investor—though it became much easier to pass such judgments in hindsight. We believe simply that plaintiff

---

**1.** A "futures contract" is a commitment to deliver or receive a specified amount of a given commodity at a certain future price and time. A September "long" silver future, for example, obligates the holder to purchase a specified amount of silver in September for a price currently designated. A short position in September silver, by contrast, obligates the holder to sell a specified amount of silver in September at the currently designated price.

Each "lot" or futures contract represents an obligation to purchase or to sell 5,000 ounces of silver. Thus, plaintiff's purchase of 10 September "lots" represented a 50,000 ounce (5,000 x 10) commitment.

would not be an "easy mark" for an unscrupulous broker. Successful in his own business, which shares important features with the commodities industry,[2] familar with discretion and non-discretionary accounts and the mechanics of commodities trading, plaintiff possessed the requisite ability to succeed in commodities. Plaintiff closely monitored his investments by reading his account statements, speaking to his brokers and bringing errors to their attention. Plaintiff was thus resourceful and vigilant, two qualities which bear directly on our resolution of this controversy.

### Robert Sherman

During the period in question, defendant Robert Sherman was employed by defendant T&S as Vice President in charge of operations and was a one-percent shareholder in the company. He received a salary and bonuses, but was not compensated by commissions. By March of 1982, Sherman had sustained a loss of $67,000 speculating for his own account in commodities. This sum was significantly larger than Sherman's base salary. T&S loaned Sherman money to cover the loss, and permitted Sherman to engage in limited "day trading"[3] to pay back the loan.

Sherman met plaintiff at a party given by plaintiff's employee and the wife of Sherman's first cousin, Brenda Giugliano, in April 1982. Though plaintiff suggests otherwise (claiming *inter alia* that Sherman wore a jacket emblazoned "T&S Commodities"), we find little to support an allegation that the meeting was prearranged for business purposes. Nor do we find, as plaintiff contends, that Sherman somehow "lured" plaintiff to trade at T&S with unethical promises of inside information. Indeed, plaintiff, by phoning Sherman some weeks after the party, was probably the prime mover in starting the business relationship. There is little indicia of active solicitation, let alone sharp dealing, on the part of Sherman, even according to plaintiff's own account of the initial meeting:

Q [D]id you discuss the status of your commodities account at Bache?

A We started talking about commodities on a general basis and I advised—I spoke with Bob and we started talking on a general basis about commodities, about where they felt they would go, what he did, what his firm did, what T&S Commodities was, etcetera.

Q What did he say—what did he say about where he thought the commodities market would go?

A He felt the commodities market was in a down trend as far as the silver went because they were basically silver and gold specialists.

Q They meaning?

A T&S Commodities. He felt that he had—T&S Commodities was one of the leaders in their industry. He was very cordial. He was very, very nice. He asked me if I had ever seen the Commodity Exchange in New York and the World Trade Center, which I had not, and he said he would be pleased to take me up there, due to the close relationship that I had with Louis and Brenda.

He gave me his business card. He asked me to please call him if I ever had any questions or if there was anything that I could do for him and he suggested to me that possibly the big institutional firms weren't necessarily the best places in the world to be trading commodities.

Q Had you told him prior to that comment that you were trading—that you had invested in commodities through Bache?

A I had mentioned Bache and I had mentioned that I had traded commodities

---

**2.** Most notably, both insurance brokers and commodities brokers carry "errors and omissions" policies, and generally, are held accountable for going beyond their authorized discretion.

**3.** "Day trading" requires the liquidation of one's account by the close of trading each day so that no positions are held overnight. The strategy has been used to limit risk and to enable the trader and his broker to better monitor the account.

with Bache or that I had—I presently was in the Futures position with Bache.

\* \* \* \* \* \*

Q Did he make any comment to you on the occasion of that party about the management of your account at Bache?

A I don't think he made specific comments at that party, if memory serves me right. I think it was in a subsequent conversation that we started getting into some harder detail about it and I think—

\* \* \* \* \* \*

Q So did Mr. Sherman say anything to you regarding the services that T&S might provide to you if you were to move your account to T&S at the party?

A No. We didn't discuss me moving my account to T&S at the party.

\* \* \* \* \* \*

Q Can you recall anything else about the conversation on April 24, at this time?

A Other than the fact that Mr. Sherman expressed his help, that he would be happy to show me the commodities floor and get together at a later date, and if I should have any questions to please call him, not in relationship to commodities, except again that he felt that the silver was going down and not up.

\* \* \* \* \* \*

MR. BRODSKY: I just wanted to ask Mr. Herman what he meant by his answer just now "Not in relation to commodities".

A What I thought I said was nothing else in relation to commodities other than that. The rest of the conversation, party conversation. It was a small intimate party. It was six or seven people there. That was it.

Tr. pp. 55–59.

Plaintiff's subsequent contact with Sherman occurred through frequent brief phone conversations commencing approximately May 20, 1982. In these conversations, Sherman emphasized his belief that the silver market would fall and that plaintiff, who held physical silver and a silver futures position, was on the "wrong side" of the market. *See, e.g.,* Tr. p. 68. Sherman also told plaintiff that commissions at T&S would be significantly lower than at Bache and that T&S received especially good information about market movements. Interestingly, over the Memorial Day weekend, plaintiff called Sherman at his home to discuss trading and plaintiff then agreed to transfer his commodities account to T&S.

### June Trading

Pursuant to his discussions with Sherman, on June 1, 1982, plaintiff liquidated his physical silver holdings and his long silver position.[4] On that date, plaintiff also established a "short" position in silver by selling 20 September 1982 silver futures contracts (10 contracts were sold at $6.22 per ounce, and 10 were sold at $6.275 per ounce). Oddly enough, these transactions were all effected through the Bache account, at plaintiff's direction, despite plaintiff's dissatisfaction with the Bache commission structure.

On June 7, 1982, plaintiff and Sherman met for dinner and business discussions during which time plaintiff executed "New Account" forms to transfer his commodities account from Bache to T&S. These forms included a "Risk Disclosure Statement," which briefly explained the risks of commodities trading (*e.g.,* "The risk of loss can be substantial ... You may sustain a loss of the initial margin funds and any additional funds that you deposit with your broker ... If you do not [post additional margin], your position may be liquidated at a loss ... The use of leverage can lead to large losses as well as gains ....") and a "Letter of Hypothecation," authorizing T&S to repledge or sell collateral posted by Herman.[5]

4. In the commodities market, a long position, a contract to take delivery at some future date, is liquidated by selling an equivalent short position, a contract to deliver goods at some future date and *vice versa*. *See supra* n. 1.

5. Ironically, these new account forms were revised very shortly after June 7 to include an

At the June 7 meeting, we find that plaintiff and Sherman had a lengthy discussion about commodities trading strategies. Sherman urged plaintiff to employ "stop losses" in his trading, so as to reduce the magnitude of downside risk. Tr. pp. 80–85. The strategy discussed would also limit the amount of possible profit-taking:

> [T]he way Mr. Sherman suggested that we handle the situation is once we got to a dollar ten, okay, that we put a stop loss in, 10 cents back to protect that dollar objective and that dollar profit that we had obtained. Okay. He wasn't exactly sure that he wanted to liquidate immediately upon a dollar but he did say that it was important to protect the dollar once we got to a dollar ten.

Tr. p. 84. Stop losses would be used both "physically" and "mentally" and trading objectives reviewed frequently in light of market movements.

The transactions which are at the heart of this lawsuit took place on June 8, 1978.[6] On this date, it is undisputed, that Sherman engaged in substantial unauthorized trading in plaintiff's account. The transactions may briefly be summarized as follows: First, plaintiff's commodities positions—consisting of 20 September 1982 futures contracts sold short—and a $30,000 check to cover margin requirements were transferred from Bache to T&S. Sherman then, via a number of separate transactions occurring between the hours of approximately 10 A.M. and 2:30 P.M., reversed the 20 contract short position to a 21 contract long position. After the close of business on June 8, plaintiff was told about the day's transactions and ensuing losses of approximately $7,300.

At trial, Sherman testified that he attempted without success to telephone plaintiff at plaintiff's office approximately six times throughout the business day on June 8. On each occasion, according to Sherman, plaintiff's secretary told Sherman that plaintiff was unavailable and would return the calls. Tr. p. 476. We find this testimony incredible, in view of the directly contradictory testimony of plaintiff's secretary and the detailed phone call logs introduced at trial.[7] Instead, we find that Sherman first attempted to advise plaintiff of the transactions after the market had closed for the day on June 8. The first phone call, as revealed by the phone log, took place at approximately 4:35 P.M., at which time plaintiff was not available. Plaintiff returned this call shortly thereafter.

When plaintiff returned the call, Sherman advised plaintiff of the transactions in plaintiff's account. While there is evidently some dispute as to the specificity and length of the conversation, *compare* tr. pp. 100–114 and tr. pp. 479–482, it is not disputed that Sherman advised plaintiff that Sherman changed plaintiff's position to short and that plaintiff had lost approximately $7,000 to $10,000 in the day's trading. Sherman indicated his belief that the market would rise the next day, and urged plaintiff to be patient. Plaintiff's reaction to the conversation, as related by both plaintiff and Sherman at trial, could aptly be described as one of mild surprise. He told Sherman that he "thought the whole idea was we were going short" or something to that effect. Tr. p. 108. Sherman admits that although he knew plaintiff had a right to disavow the transactions, he did not so advise plaintiff. Tr. p. 479.

---

arbitration provision. Had plaintiff signed these revised forms, this controversy would have been arbitrated in the first instance.

**6.** The days of June 7 and 8, 1978 witnessed a sharp increase in tension in the Middle East, spurred by Israel's invasion of Lebanon. Though war news generally increases gold and silver prices, all parties discounted the Middle East situation as an important factor in the June 8 investments.

**7.** Though defendants did establish that on one occasion, in unrelated incident distant in time from the phone calls at issue here, plaintiff's secretary failed to advise plaintiff of a phone call received while plaintiff was out of the office, this plainly cannot support an inference that the numerous phone calls allegedly made by Sherman were inadvertently not reported to plaintiff or recorded in the phone log.

Plaintiff and Sherman disagree about whether plaintiff indicated his approval of the transactions. Sherman claims that plaintiff said "Okay, fine," Tr. p. 480, or "All right," *id.* at 482. Our review of plaintiff's exhibit 7, a tape recording of a conversation between plaintiff and Sherman made by plaintiff on June 17, 1982,[8] convinces us that Sherman is correct on this point. The transcript of the recording reads:

DAH [plaintiff]: *You tell me what I said to you.* I don't recall saying anything to you except I said I thought we were going short and you said I see an opportunity and I am going long.

RS [Sherman]: *And you said O.K., fine, let's ride with it. Those were your words exactly.*

DAH: *At that point, I spoke to you at the end of the market because I looked at as we already lost $5,000 in the trade at that point.*

RS: Right.

DAH: All right, we had already taken a $5,000 loss at that point.

RS: Right.

DAH: All right.

RS: Umm.

DAH: And you felt, watch the market tomorrow morning, it is going to open up real strong.

RS: O.K.

DAH: O.K., that day I think, it went down another $20,000, the following day I think it ran up again, O.K., to around 620 or something.

RS: Umm, umm.

DAH: OK, I don't have the exact numbers I could look in the files and get the exact numbers. All right, once you

made the change, okay, I was riding basically on hopefully, ok, making the right decision.

RS: You are right.

DAH: O.K., I don't dispute that, I didn't say sell out my position tomorrow. I didn't say anything. I just said we'll see what happens. You didn't expect what to happen to happen; I didn't expect what to happen to happen ....

In the highlighted sections, plaintiff effectively admits that he did say "O.K. fine, let's ride with it."

There is at least one additional dispute with respect to the events of June 8, 1982. Although plaintiff, in the amended pretrial order, "expressly abandoned ... all issues raised in Count II [and] ... Count IV of the amended complaint," he now apparently seeks to revive the claim and make it the centerpiece of this lawsuit. *See* Plaintiff's Post-Trial Memorandum, pp. 2–8. Count IV alleges *inter alia* that Sherman engaged in the unauthorized trading "in order to be in a position to allocate a profitable transaction to his own account and a losing transaction to someone else's account," and accordingly, "he omitted to advise T&S or its floor broker at the time that he caused such transactions to be made, of the name of the account holder for whom such transactions were ostensibly made or the number of his account." More than a scintilla of evidence supports this proposition. Sherman, who owed the large sum of $67,000 to his employer, was permitted to "day trade" to make up the deficiency. He usually day-traded by taking 30 lot positions, Tr. p. 527, whereas plaintiff stated he would be comfortable trading 20 lots, Tr. p. 474. For a substantial period of the day on June 8, the account at issue was carrying a 30

---

**8.** Two sets of tape recordings were introduced at trial. Plaintiff's exhibit 7 was a recording of a conversation between plaintiff and Sherman made by plaintiff with Sherman's consent. The conversation took place at plaintiff's office on June 17, 1982, and focused primarily on the June 8, 1982 unauthorized trading. Plaintiff made the recording after consulting with his lawyer.

Plaintiff's exhibits 5A and B are recordings of June 15 conversations between plaintiff and

Sherman, and Sherman and his floor traders. The exhibits comprise three separate conversations. The recordings were made as part of T&S's ordinary practice of preserving verbal commodities orders through use of a "tapped" or "wired" telephone. These recordings *inter alia* capture the June 15 trading in progress. A similar record of the June 8 trading was not available. *See infra* p. 1419.

lot long position. Moments before the close of trading, Sherman attempted to short 10 lots, which would have left the account in a 20 lot long position.[9] Irregularities exist with respect to the time-stamping of orders and fills, Tr. pp. 459, 464, 470, 475–76. Also, a margin call was delayed because the June 8 trades were attributed—due to "key punch error," Tr. p. 483, according to Sherman—to an improper account number. Finally, the trading at issue here occurred on the very day the account was transferred and on the day following the parties' discussion of trading strategy.

Though these circumstances may raise suspicions that this case involves a graver breach of fiduciary duty than unauthorized, but well-intentioned trading, we decline to, in effect, find for plaintiff on Counts II and IV. The issue was simply not adequately developed at trial, and was ancilliary and secondary to the question of ratification. *Cf.* F.R.Civ.P. 14(b).

We note, however, that while plaintiff has failed to establish that Sherman intended to shift his losses into plaintiff's account, defendants have not foreclosed this possibility.

On June 9, the silver market opened lower, and plaintiff's losses mounted. He spoke to Sherman early in the morning on that date, and was advised of the approximate amount of those losses. Tr. p. 115. Plaintiff was aware on June 8 and 9 that he could have ordered Sherman to reverse his position from long to short. Tr. pp. 239–40. Plaintiff's losses continued to grow from June 9 until the date was liquidated. Throughout this time, plaintiff had many conversations with Sherman and was aware at all times of the approximate amount of his losses. Tr. pp. 249–253. Though plaintiff did not receive a timely margin call, we believe plaintiff's trading

experience alerted him to the fact that he was in margin deficiency as of June 9. *See, e.g.,* Tr. p. 253.

On June 10 or 11, plaintiff was presented with a "plan" to recoup his recent losses and limit his current exposure. Under the plan, plaintiff would provide T&S with $40,-000. Not surprisingly, there are two versions of how the $40,000 would be utilized. *According* to plaintiff, Sherman told him that if he paid $40,000, the firm would absorb additional losses occurring in the September position and hold it "until the position came back." The initial margin of $30,000 would then be used to "day trade" in plaintiff's account. Tr. pp. 125–28. Sherman, on the other hand, contends that the $40,000 would have been used to effect a "straddle" in plaintiff's account.[10] The "straddle" would have limited the risk of additional losses and reduced plaintiff's margin requirement. Sherman contends that the $40,000 would have been sufficient to satisfy the margin requirements on the proposed straddle and to permit "day-trading."

For the reasons detailed below, we find it unnecessary to determine the precise nature of the proposed plan. Similarly, most of the events occurring subsequent to June 9 have little bearing on our resolution of this case. To briefly summarize these events: On June 10 or 11, plaintiff received written confirmation of the June 8 trades which advised him to "report any difference immediately" and that failure to do so "will be deemed your agreement that this statement is correct and ratified." On June 15, "day trading" took place in plaintiff's account, which caused a net loss for the day of approximately $6,000. The amount of this loss would have been lower had Sherman placed a "stop loss" on his long position, as he told plaintiff he would.[11] The parties now disagree about

---

**9.** Sherman only succeeded in selling 9 of the lots, so the account was 21 lots long at the close of the day.

**10.** In a "straddle," an investor limits his exposure by maintaining both long and short positions.

**11.** Counsel appears to concede that Sherman was at fault in failing to execute the stop loss. *See* Tr. p. 689; Defendants' Post Trial Memorandum, p. 53.

whether the June 15 trades were authorized. Also on June 15, plaintiff spoke to his attorney about the transactions of June 8, who advised him that he had a right to reject these trades and insist that his original position be restored. The next day, plaintiff advised Sherman that he wished to reject these trades. On June 17, George Kaufman, T&S's Vice President, attempted to liquidate plaintiff's position by placing an order to sell 21 *July* 1982 silver contracts. Though Kaufman did not succeed in liquidating the account, because he inadvertently sold July rather than September contracts, he succeeded in creating a hedge which insulated plaintiff's account from additional price fluctuations. On June 18, 1982, Kaufman successfully liquidated plaintiff's account. After liquidation, the account reflected a debit balance of $90,-110.

On June 21, Kaufman and Sherman met with plaintiff in plaintiff's office. Kaufman, who also had suspicions that Sherman and plaintiff were in cahoots, "wanted to hear Mr. Herman's version of the story." Tr. p. 586. Kaufman became extremely upset at the meeting and at one point told Sherman "You're fired." A short time thereafter, Sherman was fired because, according to Sherman, he failed to maintain proper margin in plaintiff's account. Kaufman did not testify at trial.

## CONCLUSIONS OF LAW

### I. *Alleged Misrepresentations and Omissions Prior to June 8*

Plaintiff's allegations may conveniently be divided into two broad categories: (1) those concerning defendant's activities in the period prior to the unauthorized trading; (2) those relating to the unauthorized trading of June 8 and the period immediately thereafter. Within each of these categories fall allegations of misrepresentations and omissions, which, plaintiff asserts, constitute violations of the Commodity Exchange Act and common law fraud.

Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, makes it unlawful for market members, *inter alia*, "to cheat or defraud or attempt to cheat or defraud" investors. In *Merrill Lynch v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the Supreme Court held that a private right of action exists under this and several other provisions of the Act.

■ Section 4b, like analogous provisions of federal securities law, imposes liability on brokers for omissions and the making of material misrepresentations. *See, e.g., Hoetger & Co. v. Ascencio*, 572 F.Supp. 814 [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,834 at 23,-414–15 (CFTC ALJ May 29, 1979). The "materiality" of an undisclosed fact has classically been determined by inquiring whether "a reasonable man would attach importance [to it] in determining his choice of action in the transaction in question." *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied sub nom. List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). *List* modified this test to include the element of subjective reliance; the Court asked "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." *Id.* at 463. An investor's experience must thus be considered to determine whether Section 4b has been violated. *See, e.g., Dachslager v. Rosenthal & Co.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,890 (CFTC ALJ Sept. 7, 1979); *Waggoner v. Rosenthal & Co.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,623 (CFTC ALJ June 12, 1978); *Cleveland v. Clayton Brokerage Co.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,490 (CFTC ALJ Oct. 6, 1977).

Plaintiff claims that violations of 4b occurred prior to the time of the unauthorized trades. Principally, plaintiff claims that Sherman, in inducing plaintiff to become a T&S customer, (1) wrongfully failed to inform plaintiff about Sherman's lack of experience in "retail" or "upstairs" trading, and (2) misrepresented the services that T&S could provide for plaintiff. Plaintiff also suggests that Sherman neglected

to inform plaintiff of the risks of commodities trading.

■ We do not believe plaintiff has proven a violation of the Act or common law fraud with respect to the above allegations. At the time plaintiff opened his account, T&S executed trades exclusively for professional, institutional investors. Plaintiff was the company's first retail or "upstairs" customer. We find it difficult to believe that plaintiff was not aware of this fact. Sherman claimed that he so informed plaintiff, Tr. p. 388; and plaintiff concedes that Sherman explained that T&S was a market specialist with access to especially good information. *See, e.g.,* Tr. p. 73. Herman was in regular communication with his broker Paul Sheldon, Tr. p. 97, and could readily have inquired about the nature of T&S's business.

In any event, assuming arguendo that plaintiff was not so informed, we do not find this omission material. We believe plaintiff would have opened his account even if apprised of T&S's lack of retail experience. Plaintiff was primarily attracted to T&S because of its low commission charges and its direct access to trading floor information. Retail experience would be of little importance to an investor who expected to make his own investment decisions.

■ We similarly reject plaintiff's claims predicated on Sherman's alleged failure to advise plaintiff that Sherman had no retail customers and worked exclusively in the "back office." We note that Sherman gave plaintiff his business card at their first encounter. The card read "Robert Sherman, Vice-President of Operations." Tr. p. 58. Even if plaintiff was not on notice that Sherman did not handle "retail accounts," for the reasons stated above, we do not find the lack of such information "material." We also do not find that Sherman misled plaintiff with promises of illegal "inside information." *Compare Beshara v. Spath* [1977–1980 Transfer binder] Comm.Fut.L.Rep. (CCH) ¶ 20,616 at 22,533 (CFTC ALJ May 24, 1978) ("Complainants were lead to believe that they were being presented with the opportunity to buy or sell futures contracts with the benefit of exclusive, prior, certain knowledge of the direction in which the market price of specific commodities would move. Such information does not exist."). Though undoubtedly some "puffing" did occur, the statements made to plaintiff with respect to information T&S was privy to were essentially accurate and not actionable. *See* Tr. p. 218.

■ Finally, we dismiss as meritless any suggestion that plaintiff lacked knowledge of commodities trading in general or the market's attendant risks. Plaintiff had experience in discretionary and non-discretionary accounts, futures and physical commodities positions. At Bache, he had been subject to margin calls and had lost a significant sum of money. On June 7, 1982—the day before he transferred his account to T&S—plaintiff and Sherman had an extensive discussion of "stop loss" techniques and plaintiff signed a comprehensive Risk Disclosure Statement. *See, e.g., Dachslager, supra* at 23,621 (rejecting claim of misrepresentation in light of, *inter alia,* complainant's experience and printed disclosure documents). In sum, by June 8, 1982, plaintiff was fully and painfully familiar with leverage, margin, and the possibility of enormous losses.

For the foregoing reasons, we do not believe plaintiff has proven a 4b violation or common law fraud for the period prior to June 8, 1982.

## II. *Unauthorized Trading*

■ The trades of June 8, 1982 were unauthorized, and hence, violated § 4b of the Commodity Exchange Act. "[T]rades made without customer authorization belong to the futures commission merchant, not the customer." *Sherwood v. Madda Trading Co.* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,728 at 23,-021–22 (CFTC Jan. 5, 1979). Ratification, however, is a complete defense to unauthorized trading.

[R]atification exists upon the concurrence of three elements: (1) acceptance

by the principal of the benefits of the agent's act (2) with full knowledge of the facts, and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement. *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748, 752 (S.D.N.Y. 1968), *rev'd on other grounds,* 407 F.2d 521 (2d Cir. 1969) (citations omitted). Defendants bear the burden of proving ratification, such proof to demonstrate "a clear and unequivocal adoption of [the] trade by the customer." *Sherwood, supra* at 23,022. *See also Blome v. R.G. Dickinson & Co.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. ¶ 21,916 at 27,969 (CFTC ALJ Nov. 18, 1983) ("The doctrine of ratification is to be applied only where it is clear from all the circumstances that the intent of the customer was to adopt as his own and for all times the trades executed for his account without authorization."). For the following reasons, we do not believe defendants have met this burden.

▪ As noted above, the customer must have "full knowledge of the facts." *See, e.g., Bishop v. Siegel Trading Co.,* [1977–1980 Transfer Binder] Com.Fut.L.Rep. (CCH) ¶ 20,566 at 22,313 (CFTC ALJ March 7, 1978) ("true picture of the trading"). Such knowledge includes knowledge of the customer's right to disavow the trade at no cost to himself. The Commodities Futures Trading Commission explains,

[A futures commission merchant] must either inform the customer, or be demonstrably certain that the customer otherwise understands, that the customer is under a duty to make a complaint at the first reasonable opportunity should he discover unauthorized trading in his account. Any notification should be clear and unequivocal, assuring that the customer understands the import of his action or inaction.

*Sherwood, supra* at p. 23,018.

▪ Defendants have not demonstrated that plaintiff possessed knowledge of the consequences of unauthorized trading. Sherman knew of plaintiff's right to disavow (indeed, he regularly read case law pertinent to this issue), but did not disclose this information to plaintiff. Plaintiff did not have experience with unauthorized trading at either Bache or Becker. Even plaintiff's broker, Mr. Sheldon, was not fully familiar with the consequences of unauthorized trading. *See* Tr. pp. 358–59. Repeatedly, in the taped conversation of June 17, 1982, plaintiff indicated that he had just learned—plainly through the conversation with his attorney, Steven Dreyer—that the "rules of [commodities] game," like those of the insurance industry, require the broker to pay for the consequences of his unauthorized acts.

... I am being told, O.K., right, wrong, or indifferent, and I don't know, but I am being told that the rules of the game are set in certain fashions. There is no doubt about it that you acted in what you felt was my best interest. O.K., the last person in the world I am sure that wants to hurt me or one of the last people who wants to hurt me is you, O.K., or anybody else. No one is trading for somebody, O.K., no one makes a trade for somebody to hurt them. Even when I do something for a client of mine I do it to try and help them. Unfortunately, if I do something without the client's permission in my business, O.K., I can suffer. What they are telling me is if something happens in your business that way, O.K., it is the same situation. I don't dispute that there is no malice intended in this situation, etc.

P. exh. 7 pp. 5–6. We find plaintiff's expressions of surprise on the tape and on the witness stand credible. We also believe plaintiff's assertion that Sherman told or otherwise indicated to plaintiff *ab initio* that the June 8 trades were *plaintiff's* trades. *See, e.g.,* Tr. p. 104.

Having decided that plaintiff did not know of his right to disavow, we must next consider whether the non-disclosure of this right was material. We hold that in the light of all the facts and circumstances of this case, it caused the plaintiff's state of mind to be such as to preclude a finding of ratification and find this holding consonant

with the resolutions reached in similar cases. *See, e.g., Todd v. First National Monetary Corp.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,029 at 28,617 (CFTC ALJ Feb. 29, 1984); *Blome, supra* at 27,969; *Sturcken v. Clayton Brokerage Co.* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,727 at 26,866 (CFTC ALJ May 10, 1983); *Sherwood, supra* at 23,020.

First, at the close of business on June 8, plaintiff was confronted not only with a change in position but also with a loss based on the downward movement of his newly acquired "long" position and a correlative loss of profits because of the liquidation of his short position. The average person, we believe, when informed he could turn a losing trade into a winning trade at no cost would reject the losing trade. *See, e.g., Sherwood, supra* at 23,020 (difficult ... to believe that one with knowledge of right to repudiate would adopt losing trade). *Cf. Cleveland, supra* at 21,985 ("The ordinary reaction of a person, on being informed that a money-winning trade has been placed in his account, would seem to be ratification of the trade."). Such a person, even if desirous of changing his position from short to long, would be likely to put off the change to another day. That plaintiff would adopt the June 8 trade seems especially unlikely. He had, after all, lost appreciable sums of money in his initial long position and had debated for some time the switch from long to short. He was not, as he said, a person who would frequently "second guess" his decisions. Adopting the long position would have called for a "second guess." Tr. pp. 166–168. *See also* Tr. p. 216 ("Bob Sherman and the rest of the world" thought plaintiff should be short). Plaintiff credibly testified, "If I had known I had any right whatsoever, I certainly would not have accepted the loss Mr. Sherman presented to me that evening." Tr. p. 167. Defendants have not met their burden of proving this statement false.

One other factor weighs in our holding that plaintiff did not ratify the trades. As noted at trial, and *supra* p. 14–15, we are uncertain that the whole story behind the June 8 trades was exposed at trial. While plaintiff has not proven Counts II and IV, neither have defendants proven these allegations. To establish ratification, defendants must show plaintiff's acceptance of the trades with full knowledge of the facts. Defendants have not successfully negated the possibility that material facts remain undisclosed to this date. Sherman, either deliberately or inadvertently, misrepresented facts on a number of occasions during the trial. *See, e.g.,* Tr. pp. 512–14, 530–31, 660. He lied to Mr. Herman about placing a "stop loss" on the June 15 trades, and he misrepresented that plaintiff's account had been closed out, when in fact it had not been. Tr. 584. He and his firm violated several exchange rules with respect to plaintiff's account, *see e.g.,* Tr. pp. 519–520, and misstated the circumstances of Sherman's departure from T&S. Needless to say, Sherman's account of the events of June 8 must be viewed with considerable circumspection. Some evidence points to the possibility of conversion, a material fact of the highest order. Defendants have left largely unexplained the motivation behind the unauthorized trades. Tape recordings of the June 8 transactions were "recycled" and unavailable at trial. Mr. Kaufman, although present throughout the trial, did not testify.

For these reasons, defendants have failed to carry their burden of proof on the issue of ratification of the June 8 trades. The June 15 trades were also not ratified. But for the unauthorized and unratified trades of the 8th, these latter trades would never have been executed.

### III. *Damages*

#### *Estoppel/Mitigation*

 Ratification, estoppel, and mitigation are different concepts but tribunals have not always clearly distinguished among these doctrines in the commodities context. *See, e.g., Sherwood, supra,* at 23,020–22. *Mack v. Madda Trading Co., Inc.,* [1977–1980 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 20,624 at 22,564–65

(CFTC ALJ June 15, 1978). Whereas ratification always furnishes a complete defense to unauthorized trading, estoppel or mitigation can provide partial defenses. Estoppel is premised upon equitable considerations. The essence of such a finding is a consideration of whether a party by silence or action misled another from taking action to prevent further injury. In practical terms, a party cannot wait to see if an unauthorized position is successful before rejecting or accepting the trade.

*Blome, supra* at 27,969. Mitigation, of course, involves the classic notion "that one who has suffered a legal wrong, upon discovering the wrong, has a duty to take such action as is reasonable under the circumstances to avoid or minimize the damages." *Schultz v. Incomco, Inc.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. ¶ 21,677 at 26,602, *remanded on other grounds,* 716 F.2d 136 (2d Cir.1983). For the following reasons, we hold that estoppel and failure to mitigate damages bars plaintiff's recovery for the period after June 9.

In *Sherwood, supra,* the Commodity Futures Trading Commission, reviewing the decision of an administrative law judge, held that even though an investor "lacked full knowledge of his right to repudiate unauthorized transactions and to have them removed from his account without expense," he nonetheless had an obligation to bring his dissatisfaction with such trades to the attention of his broker:

> Complaining to the responsible officer or agent of one's futures commission merchant is, in the Commission's view, the mandatory first step which a customer must take to mitigate damages upon discovery of unauthorized trading. The rationale behind this rule is simple. A substantiated complaint to a broker would immediately remove the burden of the unauthorized activity from the customer and give the person or entity with ultimate legal and financial responsibility for the trade an early opportunity to close the unauthorized position according to his own market theory or trading policy. By not complaining at the first reasonable opportunity, a customer, in effect, usurps the proper role of the persons ultimately responsible for the trade, the futures commission merchant and its officers and agents. Moreover, by failing to protest, the broker would undoubtedly presume the regularity of the unprotested transactions and knowingly forego potential opportunities to liquidate the positions. In the Commission's view, any aggravation of damages occurring as the result of a customer's undue silence should not be passed on to the futures commission merchant.

*Id.* at 23,021 (footnote omitted).

Plaintiff had an astonishingly mild reaction to the losing trades of June 8. Plaintiff expressed not displeasure, but surprise: "I thought the whole idea was we were going short." He said words to the effect, "O.K., fine, let's ride with it," and as he admitted, "we'll see what happens." P. exh. 7 at p. 4. Under these circumstances, Sherman reasonably thought he had plaintiff's acquiescence in, if not approval of, the trades. *Compare Newton v. Woodstock, Inc.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,451 at 21,827 (CFTC ALJ July 25, 1977) (customer "disputed this trade the moment he learned it was on his account"). Sherman makes this plain during the course of their June 17 conversation: "I realized as soon as I did it, I realized I made a mistake. O.K. I made you aware of it that night. Right? The fact that you didn't turn around and say to me what the hell are you doing? How come?: I mean I had ...." P. exh. 7 at p. 10.

■ We believe Sherman is justifiably perturbed. By the close of business June 9, plaintiff had experienced two days of losing trades after the unlawful reversal of his short position. He received accurate accounts of these trades. *Compare Bishop, supra.* He knew from experience that these were not just "paper losses" and that he had appreciable risk exposure. Though plaintiff must be allotted some time to ap-

preciate the significance of defendant's actions, we believe his silence or failure to complain after June 9 "misled [Sherman] from taking action to prevent further injury." Plaintiff is thus estopped from recovering damages for the period after June 9.

■ Alternatively, prior to the close of business June 9, plaintiff should have mitigated damages by liquidating his long position and reestablishing his short position. Though plaintiff lacked knowledge about his right to repudiate, on June 8 and 9 he was under no delusions that would have led him to blindly follow Sherman's advice. *See* Tr. pp. 166–67. He was in constant contact with another broker. Tr. p. 243. He knew how to change his position from long to short, and had the wherewithal to do so. *See generally* Tr. pp. 238–39. Moreover, as plaintiff argued on the issue of ratification, Sherman impressed upon plaintiff that the June 8 trades were plaintiff's trades. Indeed, as plaintiff admits, between June 8 and June 15, 1982, Sherman continually asked plaintiff to "pick a number", *i.e.*, to give Sherman instructions to liquidate the long position when a loss of a certain magnitude was reached. Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law ¶ 56(b). *See also* Plaintiff's exh. 7 pp. 1–2 ("I also was asking you every single day to please pick a bottom number, pick a number where you want to write the check."). Plaintiff was thus given every opportunity and invitation to change his position. Though Sherman initially counseled patience, we believe he ceased doing so after the opening losses of June 9. The "plan" was not mentioned until June 10 or 11, and was not explained until Monday, June 14. Tr. pp. 250, 503, 125. Given plaintiff's experience, resourcefulness, and close communication with his brokers, we believe he should have taken steps to mitigate his damages not later than June 9. To paraphrase Sherman, the ball was in plaintiff's court. *See* Plaintiff's Exh. 7, p. 10. Plaintiff's personality was far stronger than Sherman's, *see, e.g.*, transcripts of June 15, 1982 telephone conver-

sations, and it was only for a brief period of time that Sherman unlawfully usurped control over plaintiff's account. *Compare Sturcken, supra* at 26,866 ("Complainant never acted as a person in control of the account.") Permitting recovery of lost profits for the period after June 9 would be "[a]llowing the customer to merely stand aside and watch the market [and] would give the customer a profit without his incurring the involved risk." *Havlik v. Merrill Lynch*, [1978–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,544 at 22,243 (CFTC ALJ Jan. 11, 1978).

### Compensatory Damages

■ Compensatory damages must place plaintiff in the position he would have been in but for defendants' conduct, taking into account plaintiff's obligation to mitigate. *Schultz v. Commodity Futures Trading Commission*, 716 F.2d 136 (2d Cir.1983), furnished a test for the calculation of damages for unauthorized trading: The measure of damages for wrongful liquidation of a commodities position is either (1) its value at the time of liquidation or (2) its highest intermediate value between notice of the liquidation and a reasonable time thereafter during which the position could have been replaced, whichever of (1) or (2) is higher.

Adapting this test to the facts before us, we must determine the highest value plaintiff's 20 lot short position would have reached on June 9, 1982. As set forth in plaintiff's brief on damages, plaintiff's short sale of 20 September silver futures contracts obligated him to deliver 100,000 ounces of silver at a price of $624,750 (50,-000 ounces [10 contracts] at $6.2750 per ounce and 50,000 ounces [10 contracts] at $6.2200 per ounce). This short position had its highest value at the time when the price of an off-setting long position reached its lowest point.[12] The amended pretrial order indicates that on June 9, 1982, September silver traded as low as $6.0200 per troy ounce. At this price, plaintiff could have

12. *See supra* n. 4.

gone long to liquidate his short position at a price of $602,000 (6.02 x 100,000 ounces). Plaintiff thus would have made a maximum profit of $22,750 less commissions [13] had he liquidated his short position on June 9 ($624,750.–$602,000.), and he may recover this amount from defendants. To this figure must be added the $30,000 that plaintiff transferred to T&S on June 8. We further find that prejudgment interest compounded daily at the annual rate of 11%, 26 U.S.C. § 6621, computed from June 9, 1982 should be included in plaintiff's award. *See, e.g., Ruddy v. First Commodity Corp. of Boston* [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,435 at p. 26,086 n. 18 (C.F.T.C. March 31, 1981), *affirmed*, 676 F.2d 1 (1st Cir.1982) (prejudgment interest, while a matter of discretion, should be rule rather than exception).

### The Debit Balance

Defendants argue that "[e]ven if Herman is found not to have ratified the unauthorized trades, his conduct on June 9 and thereafter should estop him from disclaiming responsibility for future losses. The . . . lost profits would thus be no more than a setoff against the $90,110 debit balance." Post Trial Memorandum, p. 64 footnote. Defendants, thus, essentially argue detrimental reliance, the counterpart of equitable estoppel. For the following reasons, we decline to find detrimental reliance.

■ Detrimental reliance is premised on the fact that an *innocent* party relied to his detriment on the fraudulent or inequitable conduct of another. *See, e.g., Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 881 (E.D.N.Y. 1978) (right must be "firmly planted in good faith"); *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72, 76 (S.D. N.Y. 1978) (citing cases). Sherman is plainly not an innocent party. He is at least as responsible as plaintiff for the damages incurred subsequent to June 9. He withheld information from plaintiff with respect to plaintiff's rights. He misled plaintiff about trades occurring after June 9. Even

if he did rely on plaintiff's failure to protest, this was in contravention of Exchange Rules which proscribe trading in undermargined accounts. This case may thus be distinguished from *Sherwood*, where the investor failed to alert his new account supervisor that the firm's former employee had executed unauthorized trades. In this case, unlike Sherwood, the broker had no occasion to "presume the regularity of the unprotested transactions." *Sherwood, supra* at 23,021. Under these circumstances, the flexible and *ad hoc* doctrine of equitable estoppel, *see Sherwood, supra* at 23,022, may fairly be employed to place a cap on plaintiff's lost profits but should not limit defendants' losses on an account which—because of plaintiff's failure to ratify—ultimately belonged to defendant. *See* Restatement (Second) of Contracts § 90 (remedy for detrimental reliance "may be limited as justice requires.").

### Punitive Damages

■ Defendant's violation of the Commodity Exchange Act may constitute common law fraud, for which punitive damages would be available. We find it unnecessary, however, to decide the question of common law fraud. Assuming arguendo that it has been established, we decline to award punitive damages because the previous section, in denying defendants' recovery of the debit balance, adequately recognizes the equities and the need for deterrence.

For the foregoing reasons, we find that defendants violated § 4b of the Commodity Exchange Act and direct plaintiff to settle an order on notice in accordance with the above findings.

SO ORDERED.

---

**13.** We believe commissions should be calculated at the rate T&S agreed to charge.