**LINCOLN COMMODITY SERVICES, a Division of Lincoln Grain, Inc., Appellee,**

v.

**Thomas MEADE, Appellant.**

**No. 76–1924.**

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1977.

Decided July 11, 1977.

<hr/>

Daniel W. Boyle, Iowa City, Iowa (argued), and William M. Tucker, Iowa City, Iowa, on brief, for appellant.

Richard G. Santi and Dennis D. Jerde, Des Moines, Iowa (argued), and on brief for appellee.

Before VOGEL, Senior Circuit Judge, LAY and HENLEY, Circuit Judges.

VOGEL, Senior Circuit Judge.

Lincoln Commodity Services (Lincoln), a division of Lincoln Grain, Inc., is a brokerage concern engaged in the sale and purchase of commodity futures contracts for the benefit of its customers. Thomas Meade (Meade) was a customer of Lincoln from October 1972 until early April 1973. When Meade's account with Lincoln was closed, there was a debit balance of $149,-312.25. Lincoln brought suit in U.S. District Court for the Southern District of Iowa to recover this balance. Jurisdiction was based on diversity of citizenship and amount involved. Meade counterclaimed, alleging violations of Lincoln's fiduciary duties, the Commodities Exchange Act, and regulations promulgated under that Act. The district court (Judge William C. Stuart) decided in Lincoln's favor, and Meade appealed. We affirm.

Appellant Meade opened a commodity trading account with appellee Lincoln by executing a "Customer's Agreement" on October 2, 1972. Meade eventually deposited $27,500 in this account. In late 1972 and early 1973 Lincoln's agent, LaVern Halverson (Halverson), made purchases and sales for Meade's account. These were margin trades. The trial court found that not all of these transactions were specifically authorized by Meade, but that Meade did not object to the unauthorized trades when he was notified of them through subsequent written confirmations by Lincoln.

The commodities markets were rising in early 1973 and the transactions made for Meade's account produced large equity gains. By early March 1973, Meade's account balance stood at more than $200,-000. Later in the same month the markets went into a steep decline, causing Meade's account to become undermargined. There was conflicting testimony in the district court on the number and timing of margin calls made by Lincoln once Meade's account became undermargined. On March 28, 1973, the markets collapsed. In the course of that day, Lincoln's agent, Halverson, made several substantial trades for Meade's account, none of which was specifically authorized by Meade. Most of these trades were made to close out long positions in Meade's account. That day there was also a purchase and sale of eighty hog contracts, and an oversale of five pork belly contracts. After the March 28 trades, Meade's account showed a loss of more than $170,000 in its equity balance.

On March 29, 1973, representatives of Lincoln met with Meade and requested that he deposit additional funds in his account. Similar requests were made on March 30 and April 2, but Meade did not deposit additional funds. In a letter postmarked April 2, Meade informed Lincoln that he "did not give authorization to the big trades that put this account in trouble." On April 3 and 4, 1973, Lincoln proceeded to liquidate the remaining positions in Meade's account. This liquidation produced the final account deficit of $149,312.25.

After trial to the court, Judge Stuart issued findings on May 26, 1976, and again on September 14, 1976. In its Memorandum Opinion and Order of September 14, 1976, the district court stated:

> The Court is of the opinion that all transactions in Meade's account which were made by Halverson without Meade's express authority and knowledge through March 27, 1973 were later ratified by Meade's failure to object as required by the Customer Agreement and under the law of ratification and agency. Therefore, the focal point of this lawsuit is the transactions in Meade's account on March 28, 1973, the day the market collapsed. Transactions on subsequent days were for the purpose of liquidating Meade's account for failure to meet margin requirements.

> \* \* \* \* \* \*

The Court believes Halverson had placed unauthorized orders for Meade but finds Meade acquiesced in this activity rather than objecting to it. The Court gained the impression from Meade's own testimony that he was willing to accept the benefits from Halverson's dealings for him as his account grew from $27,500 to $170,000. The Court is of the opinion that Halverson had reason to believe, because of their prior dealings, that he was authorized to place the March 28 orders for Meade.

At some time prior to March 28 Meade impliedly or specifically approved of this activity by Halverson. The Court also finds that the transactions on March 28 made by Halverson without express order from Meade were in line with the practice that had developed between them. There is no other logical way to explain the activity in the account on March 28, the failure of the parties to discuss the issues in the meeting on March 29 and the subsequent conduct and events. Observation of the parties on the witness stand adds subjective support to the Court's finding.

The court rejected Meade's argument that the March 28 trades exceeded the scope of previous unauthorized trades, and concluded:

An agent can reasonably infer that a principal wishes him to continue a practice not objected to or acquiesced in. A principal is under a duty to indemnify an agent who makes payments on his behalf on the basis of authority so acquired. Restatement of the Law of Agency (2d Ed.) § 7 and Comment (c) § 15, § 26 and Comment (d) § 43, § 438 and § 439.

The district court also rejected Meade's counterclaim, finding that he had failed to prove gross mismanagement, breach of fiduciary responsibility, trading without Meade's consent, "churning" of Meade's account, or fraudulent deception as to market conditions by Lincoln. The district court found that it was not necessary to decide whether Chicago Mercantile Exchange Rule 928 (relating to margin calls)

and Rule 942 (relating to discretionary accounts) had been violated by Lincoln because: (1) no private federal cause of action arises from violation of these exchange rules, and (2) violation of either rule would not have been the proximate cause of Meade's losses.

In this appeal, Meade argues:

1. The district court erred in finding that through a course of past conduct Meade had granted Lincoln authority to make trades for his account without specific authorization;

2. Meade has no duty to indemnify Lincoln as his agent, when Lincoln's acts exceeded its authority, or were performed in an illegal enterprise;

3. Lincoln is liable to Meade for losses suffered as a result of unauthorized trades; and

4. A private cause of action arises from violations of rules of the Chicago Mercantile Exchange, which violations were a proximate cause of Meade's losses.

I.

The trial court did not commit clear error in finding that through a course of past conduct Meade had granted Lincoln authority to make the challenged trades for his account. Meade testified that Halverson, Lincoln's agent, had been taking unauthorized positions for Meade's account since January 1973. Meade had permitted Halverson to continue this practice. He did not make written notice of objection to any of the trades until April 2, 1973, though the Customer's Agreement specifically required such notice.

■ Meade argues that the prior unauthorized trades were not similar in scope to those made for his account on March 28, 1973. This question is best left to the trial court judge, who was sitting without a jury and was therefore the finder of the facts. His determination is supported by the fact that most of the transactions of March 28 were made to close out long positions in Meade's account which had come into existence prior to March 26, 1973. Thus, the

district court found that "the great bulk of the cash loss for [March 28] ($141,126.00) came from closing out positions already held." This loss was a reflection of the precipitous decline in the markets in the preceding week, rather than solely the result of the March 28 trades.

 The sales made subsequent to March 28, 1973, were within Lincoln's authority pursuant to the Customer's Agreement to liquidate the account for failure to meet margin requests. This court upheld a similar liquidation provision in *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571 (8th Cir. 1975).

## II.

Meade argues that even if Lincoln had been given implied authority to make the March 28 transactions, Meade has no duty to indemnify Lincoln for the losses suffered in those transactions. To support this contention Meade cites the Restatement (Second) of Agency § 467:

> An agent who makes an illegal agreement with the principal to act for him, or whose services for the principal are illegal under the rules stated in the Restatement of Contracts, is entitled neither to compensation for his services nor indemnity for losses sustained by him in performing them, except as therein stated.

Meade also cites the Restatement of Contracts § 512:

> A bargain is illegal within the meaning of the Restatement of this Subject if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy.

Meade notes that the trial court found some evidence tending to prove that Lincoln had violated Chicago Mercantile Exchange Rules 928 and 942. Rule 942 sets forth requirements for account transactions by someone other than the person in whose name the account is carried. Rule 928 provides that if a customer does not answer a margin call within a reasonable time, the broker must close out the customer's trading account, at least to the extent required to restore the account to required margin status.

Meade argues that by violating these exchange rules, Lincoln contravened the public policy embodied in the Commodity Exchange Act. Meade points out that 7 U.S.C. § 7a requires contract markets (including Chicago Mercantile Exchange) to furnish the Secretary of Agriculture with copies of all bylaws, rules and regulations, and to enforce all such bylaws, rules and regulations relating to terms and conditions of contracts of sale. Meade contends that Rules 942 and 928 were enacted pursuant to this mandate and are consistent with a legislative intent of the Commodity Exchange Act to protect the investing public.

 Meade cites no caselaw in support of the contention that violation of a private commodity exchange rule is an act sufficiently "opposed to public policy" to excuse indemnification of Meade's agent, Lincoln. 7 U.S.C. § 7a sets forth the duties of contract markets. It is not specifically directed to brokers trading on such contract markets. Meade makes no allegation that the Chicago Mercantile Exchange failed to furnish the Secretary of Agriculture with copies of its rules in violation of 7 U.S.C. § 7a(1) or that it failed to enforce such rules, in violation of 7 U.S.C. § 7a(8). Nor is there an allegation of cheating, fraud or deceit in the making of the sales contracts, in violation of 7 U.S.C. § 6b. In light of this and the fact that Meade has cited no caselaw or legislative history in support of his argument, we are unable to say that he should be excused from indemnifying his agent, Lincoln, because of Lincoln's alleged violations of exchange rules.

We note that the Customer's Agreement provides that all transactions shall be subject to the exchange rules. However, in this appeal Meade does not argue that Lincoln's alleged exchange rule violations breached its contract obligations to Meade, thus excusing him from liability. *See First Mid America, Inc. v. Palmer*, 197 Neb. 224, 248 N.W.2d 30 (1976).

### III.

Meade argues that because Lincoln, through Halverson, executed the March 28 transactions without specific authorization from Meade, Lincoln breached a fiduciary duty and is liable to Meade for the losses incurred. Meade cites *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir. 1970), as support for such a damages award. However, in the *Hecht* case the court found that the customer's losses were the product of fraudulent "churning" of her account by the brokerage. "Churning" refers to excessive trading in a customer's account in order to generate commissions for the broker handling the account. *See, e. g., Booth v. Peavey Company Commodity Services,* 430 F.2d 132 (8th Cir. 1970). The instant case is distinguishable from *Hecht* in that Judge Stuart found that, "The evidence does not show margin violations or churning of defendant's account by any agent or employee of [Lincoln]."

Meade further argues that Lincoln should have liquidated Meade's account on March 29, 1973, the third day following the March 26 margin call, before the account's losses grew even larger. However, Lincoln's fiduciary duty to liquidate the account earlier than it did is far from clear. Though the markets had declined sharply, continued declines were not certain. Furthermore, there was testimony that Meade gave Lincoln the impression that he was attempting to meet the margin call and desired the account to continue to exist. The district court reasonably could credit this testimony and conclude that Lincoln did not violate a fiduciary responsibility by hesitating past March 29 before liquidating Meade's account.

In sum, we find no reversible error on the part of the district court in its failure to find that Lincoln should be liable to Meade for damages incurred through the alleged breaches of Lincoln's fiduciary duty.

### IV.

Meade urges that Lincoln violated Chicago Mercantile Exchange Rules 928 (relating to margin calls) and 942 (relating to discretionary accounts), and that these violations give rise to a private action for damages under the Commodity Exchange Act.[1]

The district court found that it was not necessary to decide whether Rules 942 and 928 were violated by Lincoln. The court reasoned that no private federal cause of action arises from violation of those rules, and that in any event a violation of either rule would not have been the proximate cause of Meade's losses.

Assuming arguendo that a violation of one of the rules in question would give rise to a private cause of action, and further assuming arguendo that Lincoln violated one or both of those rules, we do not think that in the circumstances of this case Meade has any private cause of action based on such violation.

Aside from any question of whether Meade's losses were "proximately caused" by our assumed violation or violations or whether they were "proximately caused" by the dramatic fall of the markets that has been described, the fact remains that the violations, if any, were condoned if not indeed instigated by Meade himself, and in such case we do not think that he should be allowed to base a private cause of action on such violations.

Affirmed.

1. Some courts have suggested such a right of action for violations of securities exchange rules. *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135, 141 (7th Cir.), *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). It has been argued that the same sort of right ought to be available where there are violations of the rules of contract markets upon which commodities are traded. *See, e. g.,* Note, Private Rights of Action for Commodity Futures Investors, 55 B.U.L.Rev. 804–26 (1975). However, courts have not usually recognized a private right of action for violations of exchange rules in the absence of a finding of fraud. *See, e. g., Carras v. Burns,* 516 F.2d 251, 260 (4th Cir. 1975); *Evans v. Kerbs & Co.,* 411 F.Supp. 616, 624 (S.D.N.Y.1976). In the instant case there was no finding of fraud.