**Richard B. ELLWOOD, Appellant,**

**v.**

**MID STATES COMMODITIES, INC., and Richard L. Rosenquist, Appellees.**

**No. 85–1358.**

Supreme Court of Iowa.

April 15, 1987.

Rehearing Denied May 8, 1987.

---

Patrick B. Chambers, Webster City, for appellant.

Arthur H. Johnson and James L. Kramer of Johnson, Erb, Latham, Gibb and Carlson, P.C., Fort Dodge, for appellee Mid States Commodities, Inc.

Blake Parker of Parker & Fors, Fort Dodge, for appellee Richard L. Rosenquist.

Considered by REYNOLDSON, C.J., and McGIVERIN, LARSON, LAVORATO and NEUMAN, JJ.

McGIVERIN, Justice.

This appeal involves a complex series of unauthorized commodity futures trading transactions and the consequences of those transactions. Plaintiff Richard Ellwood appeals from denial of recovery on his petition for damages for the unauthorized trading and from the trial court's assessment of damages for related check forgeries by defendant Richard Rosenquist. Defendant Mid States Commodities, Inc., a commodity futures broker, appeals from an adverse judgment on its counterclaim for a deficit balance in plaintiff's margin account. We affirm in part, reverse in part, and remand.

I. *Background facts and proceedings.* In June 1979 plaintiff Richard Ellwood, a retired farmer with previous experience in commodities trading, was solicited by defendant Richard Rosenquist to open a commodities trading account with Stotler & Company, a member of the Chicago Board of Trade. The account was to be handled by defendant Mid States Commodities, Inc. (Mid States), a registered commodities representative of a futures commission merchant, and its associated person, Rosenquist. *See* 7 U.S.C. §§ 2, 6k (1982).

Ellwood executed a customer agreement and a risk disclosure statement with Stotler on June 7. The customer agreement specified that trades on the customer's account would be binding on the customer if not objected to within five days of receipt of a confirmation slip or statement of account. Ellwood then placed $5,000 in his account. Rosenquist requested that Ellwood execute the authorization for a discretionary account.[1] Ellwood refused, leaving the account a nondiscretionary one in which Rosenquist would have to get authority from the customer, Ellwood, before executing a trade.[2]

In late June, Rosenquist began a pattern of unauthorized buying and selling of agricultural commodity futures that permeates the records on Ellwood's account. On his return from a trip to California, Ellwood received written confirmation of trades on June 26 and 27. The written confirmations from Stotler & Company noted: "Please report any differences immediately." Ellwood phoned Rosenquist about the trades. Rosenquist explained, as he would throughout most of 1979, that the trades were errors or attempts to correct errors, assuring Ellwood that he would "take care of the trades." Fourteen unauthorized trades on Ellwood's account occurred between the date the account was initially opened and the time Ellwood's first authorized trade was executed. Following the receipt of each written confirmation of a trade, Ellwood would speak with Rosenquist and accept his assurances that the "error" would be corrected.

Ellwood made the first authorized trade on his account on July 13, 1979. From this date forward it is unclear which of the several trades were authorized and which were not. Trial court found that Rosenquist made approximately 130 unauthorized trades on Ellwood's account in the six-month period from June to December 1979.

Ellwood made additional investments in his account during that period, raising his total investment from $5,000 to $26,000.

A large number of the unauthorized trades by Rosenquist resulted in margin calls[3] on Ellwood's account. Ellwood ig-

---

1. A discretionary account allows a "futures commission merchant or associated person to effect transactions in commodity interests for the [customer's] account without the customer's specific authorization." 17 C.F.R. § 166.2(b).

2. A "trade" is an order for a commodity futures contract. A "futures contract" is "an agreement to buy and receive, or to sell and deliver, a commodity at a future date in accord with stan-

dardized terms." Smith, *Commodity Futures Trading,* 25 Drake L.Rev. 1, 57 app. I (1975).

3. The amount which a commodity broker is required to deposit with his futures commission merchant is referred to as margin....

After a customer has deposited his margin and made his trade, a change in the market price may require him to make an additional

nored these requests for additional margin. Rosenquist satisfied the inquiries of Dick Stone, Mid States' office manager, by explaining the money was "in the mail." Sometimes fluctuations in the market would take care of the margin shortages.

In November and December, Rosenquist's unauthorized trading activity in Ellwood's account increased. His trading in those months resulted in a loss of $81,849.98, including commissions, and sometimes generated margin requests in excess of $50,000. Ellwood had a reminder of his contractual duty to notify Stotler & Company on the confirmation of each of these unauthorized trades. He refused to take action, however, and did not notify Stotler of any unauthorized transactions.

On December 13, another customer became aware of unauthorized trading on his account by Rosenquist, and the customer confronted Rosenquist. Stone overheard this confrontation and intervened. As a result of these allegations, Rosenquist was fired.

Mid States liquidated Ellwood's account on December 17, following Ellwood's allegation to Mid States that Rosenquist had made unauthorized trades on his account. The liquidation left the account with a $45,096 debit balance. We will highlight other relevant facts in the discussion of specific issues raised on appeal.

Ellwood filed suit against Mid States and Rosenquist alleging joint or several negligence based on violations of statutory trading guidelines, joint or several common law and statutory fraud, and joint or several conversion. Mid States answered the petition denying Rosenquist made unauthorized trades on Ellwood's account and denying the existence of an employer-employee relationship with Rosenquist. Rosenquist's answer was a general denial of the allegations. Mid States also counter-claimed for the debit balance in Ellwood's account. During trial, Mid States was granted leave by the court to amend its answer to raise the affirmative defense of ratification by Ellwood of the alleged unauthorized trades.

In a bench trial of this law action, the district court ruled on each theory raised by the parties. The court, ruling on the unauthorized trading theories of negligence, conversion and fraud, held Ellwood either expressly or impliedly ratified all the unauthorized trades. Ratification was treated as a complete defense to any award of damages to Ellwood under any theory arising out of the unauthorized trading.

Ellwood's petition also had raised fraud and conversion theories with respect to two checks, each in the amount of $25,000, that Rosenquist forged on Ellwood's bank account. The checks were never honored. Therefore, the court held no conversion of Ellwood's property occurred; however, the court allowed recovery on a statutory fraud theory. Ellwood was awarded compensatory damages of $5,000 against both defendants for damage to his credit; Rosenquist was liable as the forger and Mid States was held liable under the doctrine of respondeat superior. Punitive damages of $10,000 were assessed by the court against Rosenquist.

The court denied recovery on Mid States' counterclaim. The court found Mid States had "unclean hands" in the unauthorized but ratified trades; therefore, Mid States was ordered to absorb the $45,096 account deficit.

Ellwood appeals on numerous grounds from trial court's judgment, claiming (1) evidence was insufficient to prove Ellwood ratified the unauthorized trades, thus Mid States failed to carry its burden of proof; (2) evidence was sufficient to establish defendants Mid States and Rosenquist com-

deposit [or "meet a margin call"] if the market moves against him.
Smith, *Commodity Futures Trading,* 25 Drake L.Rev. at 13.
The amount of margin in an investor's account is determined by the equity position of the particular investor and the rules of the exchange on which the investor trades. In Ellwood's situation, he was required to have four hundred dollars of margin for every five thousand bushels of corn.
For further explanation of commodity futures trading terms and the mechanics of futures trading, see P. Johnson, *Commodities Regulation* (1982).

mitted statutory and common-law fraud in allowing unauthorized trades to occur or making such trades; (3) evidence was sufficient to prove defendants Mid States and Rosenquist converted the value of Ellwood's account to their own use since 1979; (4) trial court erred by allowing Mid States to amend its answer to raise as an affirmative defense to unauthorized trading the ratification of those trades by Ellwood; and (5) trial court erred in assessing fault to Ellwood with respect to the unauthorized trading. Ellwood also asserts, regarding the check forgeries, (1) the evidence was sufficient to establish a greater amount of compensatory damages, and (2) trial court erred in denying punitive damages against Mid States.

Mid States also challenges the judgment on cross-appeal, contending the doctrine of clean hands cannot bar recovery of an account in a legal action. It claims the evidence was insufficient to support the court's apportionment of negligence to Mid States and to support the award of $5,000 for damage to Ellwood's credit. Finally, Mid States asserts it is not responsible for Rosenquist's acts under the doctrine of respondeat superior.

■ Rosenquist filed a notice of appeal in this action; however, he failed to file a brief. *See* Iowa R.App.P. 13(f). Due to his failure to specify the issues that he appeals and his failure to cite authority in support of those arguments, we deem Rosenquist's appeal waived. *See* Iowa R.App.P. 14(a)(3), (b). Therefore, we affirm the judgment of the trial court in all respects as to defendant Rosenquist.

The issues that are decisive in this case and to which we will limit our discussion are: (1) Did trial court abuse its discretion in allowing Mid States to amend its answer to raise the affirmative defense of ratification? (2) Was the evidence sufficient to support trial court's conclusion that Ellwood ratified the unauthorized trades by Rosenquist before October 26, 1979? (3) Was the evidence sufficient to support trial court's conclusion that Ellwood ratified the unauthorized trades by Rosenquist between October 26 and December 13? (4)

Was the evidence sufficient to support trial court's award of damages for injury to Ellwood's credit on the forgery count? and (5) Did trial court err in denying Mid State's recovery on its counterclaim?

Our review of the judgment is for correction of errors at law. Iowa R.App.P. 4. The trial court's findings of fact are binding on us if supported by substantial evidence. Iowa R.App.P. 14(f)(1). If a finding of fact reasonably may be inferred from the evidence, the finding is supported by substantial evidence. *Janda v. Iowa Indus. Hydraulics, Inc.*, 326 N.W.2d 339, 341 (Iowa 1982). "We view the evidence in the light most favorable to upholding the judgment." *Trobaugh v. Hy-Vee Food Stores, Inc.*, 392 N.W.2d 154, 156 (Iowa 1986).

II. *Unauthorized trades before October 26, 1979.* Ellwood challenged unauthorized trades throughout 1979 in his petition. At trial, however, he did not challenge the pre-October 26 trades, because he and Rosenquist had reached an agreement regarding those trades.

Testimony indicated that on October 25 Rosenquist and Ellwood agreed that the account was back to the amount of Ellwood's original investment and that after October 25, 1979, Rosenquist agreed to leave the account alone except for trades specifically authorized by Ellwood. On October 26 Ellwood executed a trade with the assistance of Mid States' office manager, Dick Stone. During the conversation, Ellwood indicated there was a trade in his account that did not belong there. When Stone offered to adjust the account, Ellwood said no adjustment was necessary due to his agreement with Rosenquist.

■ Trial court determined Ellwood expressly ratified the pre-October 26 trades. We will not disturb this conclusion because there is sufficient evidence to show Ellwood either expressly ratified the trades, or he waived any challenge to such trades by virtue of his trial testimony that he sought no recovery for transactions prior to October 26.

III. *Unauthorized trades after October 26, 1979.* Ellwood claims the trial court erred in concluding he ratified the post-October 26 unauthorized trades. Among other things, he argues the court should not have considered the affirmative defense of ratification because the amendment raising the defense was untimely.

A. *Timeliness of amendment to answer.* Mid States moved, two weeks prior to trial and again at trial, to file a second amendment to its answer, pleading the affirmative defense of ratification by Ellwood. Trial court allowed the amendment over Ellwood's objection.

■ Iowa Rule of Civil Procedure 88 allows a second amendment of a pleading "only by leave of court or by written consent of the adverse party." The rule further states, "Leave to amend ... shall be freely given when justice so requires." Iowa R.Civ.P. 88. Leave to amend generally is granted when there is no substantial change in the defense or issues of the case. *Chao v. City of Waterloo,* 346 N.W.2d 822, 825–26 (Iowa 1984); *Beneficial Fin. Co. v. Reed,* 212 N.W.2d 454, 456 (Iowa 1973). We will not disturb trial court's allowance of an amendment to a pleading in the absence of an abuse of discretion. *Beneficial Fin. Co.,* 212 N.W.2d at 456–57.

■ Throughout the course of the case, Mid States tried to establish that Ellwood ratified the unauthorized trades. Mid States questioned Ellwood in pretrial depositions and on cross-examination at trial on the defense of ratification. Although leave to allow the amendment could have been filed at an earlier time, the court did not abuse its discretion in allowing the amendment; the amendment did not substantially change the issues at trial.

■ B. *Ratification as a complete defense.* Trial court denied recovery on Ellwood's negligence, fraud and conversion theories because it concluded he impliedly ratified the post-October 26 unauthorized trades. Ellwood argues that Mid States failed to sustain its burden of proof on ratification. Additionally, he contends there was sufficient evidence on which the trial court should have ruled favorably to him on his unauthorized trading claims.

When the trial court in a law action tried to the court denies recovery because of a party's failure to carry his burden on an issue, we will not interfere on appeal unless we find the party carried his burden as a matter of law.

*Roland A. Wilson & Assocs. v. Forty–O–Four Grand Corp.,* 246 N.W.2d 922, 925 (Iowa 1976).

The elements of ratification are:
(1) existence of a principal;
(2) an act done as agent;
(3) principal's full knowledge of material facts; and
(4) express or implied intent of principal to ratify acts of agent.

*Abodeely v. Cavras,* 221 N.W.2d 494, 502 (Iowa 1974). If proven, ratification is a complete defense to unauthorized trading. *Herman v. T. & S. Commodities,* 592 F.Supp. 1406, 1417 (S.D.N.Y.1984) [hereinafter *Herman II* ].

■ Under the Commodity Exchange Act, title 7, chapter 1 of the United States Code, a commodity futures commission merchant is liable for making material misrepresentations to or trying to defraud or cheat investors. 7 U.S.C. § 6b. This provision is in place to protect unskilled investors from fraudulent practices by their futures commission merchants. Commodity Futures Trade Commission rule 166.2 requires specific authorization of each trade in a nondiscretionary account by the customer on whose account the trade is executed. 17 C.F.R. § 166.2. Unauthorized trading violates both of these provisions. *Herman v. T. & S. Commodities, Inc.,* 578 F.Supp. 601, 602–03 (S.D.N.Y.1983); *Ray E. Friedman & Co. v. Jenkins,* 738 F.2d 251, 253 n. 4 (8th Cir.1984).

■ Mid States and Rosenquist can avoid liability only by proving there was a " 'clear and unequivocal adoption of [the] trade by the customer.' " *Herman II,* 592 F.Supp. at 1418 (quoting *Sherman v. Madda Trading Co.,* [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,728, at 23,022 (Jan. 5, 1979)). Mid States must show that

Ellwood had specific knowledge of his right to disavow the unauthorized trades with no cost to himself. *Herman II*, 592 F.Supp. at 1418. Trial court found that defendants met their burden.

Ellwood claims *Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193 (8th Cir.1982), is factually analogous to his situation. In *Karlen*, the investor was a rancher. *Id.* at 1196. His testimony at trial indicated he did not know how to interpret the confirmation slips and monthly statements he was receiving from his broker. *Id.* at 1198–1200. On appeal, the court found the record contained substantial evidence to support the jury's verdict that Karlen did not ratify the trades. *Id.* at 1201. Due to his lack of sophistication and experience, the jury could find he was incapable of ratifying the unauthorized trades. Karlen's experience, however, differs drastically from Ellwood's level of experience.

When Ellwood opened his account with Stotler & Company, he executed a Customer's Agreement that included the following provision:

6. *Reports* of the execution of orders and statements of account *shall be deemed conclusive and binding upon me* [Ellwood] *if not objected to in writing within five (5) days after transmittal to me* by mail or otherwise. All notification to you [Stotler & Company] under this paragraph shall be to the Compliance Department at your Chicago office.

(Emphasis added.) As previously noted, printed adjacent to the address and phone number of Stotler & Company on the written confirmations of each trade on Ellwood's account, authorized or unauthorized, and the monthly statements of account from Stotler & Company was the statement "NOTE: Please report any differences immediately."

Ellwood traded in the commodities market for two or three years in the early 1970s. At that time he dealt with Bob Zellers of Mid States Grain Company, the person who, in 1979, was president of defendant Mid States Commodities. Ellwood testified at length about the mechanics of commodity futures trading. Trial court found as a fact that he was a knowledgeable investor.

In the fall of 1979 Rosenquist was trading on Ellwood's account. He executed numerous unauthorized trades between October 26 and December 13. Stotler & Company mailed a confirmation of each of these trades to Ellwood. Ellwood would then speak to Rosenquist on the phone, sometimes as often as twelve times per day, seeking an explanation for the trades. Rosenquist would state the trade was an error or a correction of an error and assure Ellwood that any problem would be remedied.

Ellwood never challenged Rosenquist's explanation nor did he report the incidents to Stotler & Company or Mid States' office manager, Dick Stone. Ellwood testified on cross-examination about the notification requirement:

Q. [Mid States' attorney] And on every one of these statements which you are receiving daily from Stotler, it says if you have any problem with any of the information on that statement, to immediately get in touch with them, doesn't it? A. I immediately told that to Rick Rosenquist.

Q. Yeah. But that says get in touch with Stotler, doesn't it? And it gives you a phone number to call, doesn't it? A. I don't trade with Stotler. I trade with Mid States.

Q. Will you answer my question? A. Yes, sir.

Q. It gives you a phone number to call, doesn't it, Exhibit No. 4 [confirmation slip]. Right? Stotler's phone number? A. I've never called it.

In spite of the notification requirement, Ellwood failed to contact Stotler and ignored the large and numerous margin calls on his account.

As stated before, on December 13 Stone became aware of unauthorized trades in another investor's account. He immediately terminated Rosenquist and asked him to set up a meeting of Ellwood, Stone and Rosenquist. Rosenquist instead went straight to Ellwood and revealed he had

been making unauthorized trades on Ellwood's account. The next business day Ellwood went to the Mid States office and for the first time complained to Stone of unauthorized trading.

The trial court found the following facts with regard to Ellwood's ratification of the November and December trades:

Plaintiff's behavior during all this was curious, to say the least. Plaintiff received notices from Stotler almost daily detailing the trades that Rosenquist was making on his account. Plaintiff also received statements at the end of each month detailing Rosenquist's illegal activity. Plaintiff was enough of a sophisticated investor to know that Rosenquist was trading illegally on his account. He was also sophisticated enough that he knew or should have known that a complaint to either Stotler or Mid States would end the illegal trading. Furthermore, Plaintiff knew or should have known from his conversation with Stone [on October 26] that Mid States was unaware of Rosenquist's illegal activity. Plaintiff himself actively contributed to that ignorance by first minimizing his complaint about the appearance of unauthorized trades on his account and second actively persuading Stone not to investigate or take action. Plaintiff continued to call Rosenquist daily about the illegal trades, but he never contacted anyone else either at Stotler or at Mid States.

. . . .

. . . In this case, Plaintiff was a sophisticated enough investor to understand the statements he received and realize that Rosenquist was trading illegally. Furthermore, Plaintiff fully understood his options. Plaintiff testified on cross-examination that he knew he could have contacted Stotler or Mid States if he had really wanted to close out his account or put a stop to the unauthorized trading. . . .

. . . On the facts before it, the Court can only conclude that Plaintiff intentionally and purposefully refrained from repudiating pursuant to the customer's agreement after he had complete knowledge of the facts because Plaintiff wanted to see if Rosenquist could straighten out the account on his own.

This case is factually similar to *Lincoln Commodity Services v. Meade,* 558 F.2d 469 (8th Cir.1977) and *Shapiro v. Bache & Co.,* 116 Ariz. 325, 569 P.2d 267 (Ariz.App. 1977). *See also Dawson v. Hornblower, Weeks, Noyes & Trask, Inc.,* [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,589, at 22,453 (April 10, 1978) (Trader complained of unauthorized trades only to account representative. Commodity Futures Trade Commission concluded trader had to have knowledge of those trades within a week of his receipt of monthly statement, even though he waited three more weeks before voicing his objections; thus, the commission determined trader ratified the trades).

In the first case Lincoln brought suit to recover a $150,000 deficiency in Meade's commodity futures margin account. 558 F.2d at 471. Meade maintained a trading account with Lincoln from October 1972 to April 1973. During that period a number of unauthorized trades were executed on his account, some resulting in losses and some in gains. *Id.* Meade failed to object to the trades when he received written confirmations. He also failed to meet margin calls. After Meade's failure to meet margin calls and his assertion to Lincoln that unauthorized trades had occurred, Lincoln liquidated Meade's account at a loss of $150,000. *Id.* Meade claimed that Lincoln acted fraudulently in allowing the unauthorized trades to occur. The district court found that Meade had ratified the trades by his failure to object as required by his customer agreement. *Id.* The Eighth Circuit Court of Appeals concluded:

The trial court did not commit clear error in finding that through a course of past conduct Meade had granted Lincoln authority to make the challenged trades for his account. Meade testified that Halverson, Lincoln's agent, had been taking unauthorized positions for Meade's account since January 1973. Meade had permitted Halverson to continue this practice. He did not make written notice

of objection to any of the trades until April 2, 1973, though the Customer's Agreement specifically required such notice. *Id.* at 472.

In *Shapiro*, a knowledgeable securities investor protested to his account representative when unauthorized transactions appeared on his statements. The representative assured him that there was nothing about which to worry. Shapiro continued doing business with Bache & Company, retaining the unauthorized transactions in his account without filing a written objection to the transactions. *Shapiro v. Bache & Co.*, 116 Ariz. at 327–28, 569 P.2d at 269.

The customer's agreement Shapiro signed when opening his account with Bache stated that reports on his account would be conclusive within a specific number of days if not objected to in writing. *Id.* at 326, 569 P.2d at 268. The court determined that the contractual provision was in place to prevent unauthorized transactions by the account representative. Shapiro's failure to file written objections, relying rather on oral protestations to his account representative, deprived Bache of the opportunity to put a halt to the illegal activity. *Id.* at 328, 569 P.2d at 270. The court concluded Shapiro's failure to act ratified the unauthorized transactions as a matter of law. *Id.* at 329, 569 P.2d at 271.

■ We conclude that there was substantial evidence in the record to support the trial court's findings.[4] We conclude, and the trial court impliedly found, that Ellwood did not take steps a reasonable person apprised of the scheme of unauthorized trading would have taken, such as notifying someone with more authority than Rosenquist. He also failed to follow the dictates of the notification requirement of the customer's agreement. The findings made by the court clearly indicate the elements of a ratification as to the post-October 26 trades: an act by an agent [Rosenquist] for his principal's [Ellwood's] benefit; Ellwood's knowledge of the facts; and his intent to impliedly ratify Rosenquist's acts. Correspondingly, the evidence does not show as a matter of law that Ellwood did not ratify the post-October 26 transactions.

■ At oral argument, Ellwood argued that ratification should not have barred his action against Rosenquist. While it is clear from the pleadings that Rosenquist did not raise ratification as an affirmative defense, the record is replete with instances of questions by Rosenquist's counsel of Ellwood bearing on the issue of ratification. We conclude that the defense of ratification as to the claims against Rosenquist was tried by consent of the parties. *See* Iowa R.Civ.P. 249; *Ashby v. School Township*, 250 Iowa 1201, 1203–06, 98 N.W.2d 848, 851–53 (1959) ("Where parties proceed without objection to try an issue, even though not presented by the pleadings, it amounts to consent to try such an issue and it is then rightfully in the case."). Therefore, ratification bars Ellwood's recovery against Rosenquist on the claims of unauthorized trading.

Our ruling on the ratification issue makes unnecessary a review of the several theories of recovery by plaintiff Ellwood for unauthorized trading. Ratification operates as a complete defense to those allegations.

IV. *Check forgeries.* Our resolution of the ratification issue, however, does not dispose of Ellwood's allegations of fraud and conversion with regard to the two checks forged by Rosenquist.

In early December 1979, Rosenquist was desperate to buy time to work out of the deficit he had created in Ellwood's account. Large margin calls were being made on Ellwood's account. To reduce the scrutiny to which Stone was subjecting him, Rosenquist decided to take drastic action.

---

**4.** Ellwood did not have five days after the receipt of his confirmation of the unauthorized trade of December 11 in which to contact Stotler & Company and disavow the trade. This trade, however, resulted in a $2,000 profit for Ellwood. We conclude trial court was correct in stating that Ellwood ratified all the trades through December 13, because he either ratified the trade or suffered no loss by his acceptance of the benefits of the trade.

He took two counter checks from a local bank in which Ellwood had an account. Rosenquist forged Ellwood's signature on the two checks, each in the amount of $25,000, made out to Stotler & Company as payee. One of the forged checks was returned due to insufficient funds and Ellwood became aware of it after the December 15 meeting during which Rosenquist admitted the unauthorized trading. Stotler & Company held the other check. Therefore, neither check was honored by Ellwood's bank and Ellwood lost no money as a result of the forgeries.

Ellwood alleged in his petition against both defendants that he had suffered damage to his credit as a result of the forgeries. He also sought to recover under a theory of conversion. The court entered judgment against Mid States and Rosenquist for $5,000 in compensatory damages and against Rosenquist individually for $10,000 in punitive damages.

On appeal, Ellwood claims the evidence established his entitlement to a greater measure of compensatory damages and the liability of Mid States for punitive damages. Mid States challenges the sufficiency of the evidence to support any award of damages for injury to Ellwood's credit.

Recovery is denied when it is uncertain or speculative that damages have actually been sustained; however, recovery is allowed when the only dispute is as to the amount of damages and damages are proved with reasonable certainty. *Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968). In *Petersen v. Farmers Casualty Co.*, 226 N.W.2d 226, 231–32 (Iowa 1975), we concluded the trial court should not have submitted to the jury plaintiff's claim for impairment of credit. Peterson testified that he increased a loan on his farm to meet a disputed judgment. *Id.* He claimed that he would then have been unable to borrow additional funds. *Id.* In fact, he did not attempt to borrow additional funds. Thus, we determined the evidence was insufficient to show damage to credit, and there was no basis on which to assess damages except by surmise and conjecture. *Id.* at 232.

This case is even weaker than *Petersen*. The only evidence in the present case bearing on plaintiff's alleged loss of credit was the following. Ellwood had executed a promissory note and security agreement for the purchase of 196 steers. In April 1980 a Nebraska feed lot, where the steers were located, issued a check jointly to Ellwood and his bank for the sale of the steers, noting the bank had called to request that its name be put on the check. Under the terms of the existing security agreement, the bank was entitled to have its name on the check. Ellwood failed to call anyone from the bank as a witness to testify about the impact the $25,000 forged, returned check had on its lending relationship with Ellwood. He also presented no evidence that he was unable to borrow funds or lost credit as a result of Rosenquist's forgery.

We agree with Mid States that the evidence of injury to Ellwood's credit was speculative at best. Therefore, we reverse the district court judgment against Mid States for damages for injury to Ellwood's credit. We do not relieve Rosenquist from liability for compensatory and punitive damages, however, for the reasons stated in division I.

V. *Counterclaim on deficit balance of account.* Mid States counterclaimed for the deficit balance of $45,096 in Ellwood's margin account. Mid States had to pay this amount to Stotler & Company to close out Ellwood's trading account. Mid States argues that Ellwood's ratification of the trades binds him to cover the losses that resulted therefrom.

Trial court invoked the doctrine of "clean hands" to bar recovery on the counterclaim. It stated the court could not lend its aid to the conduct of Mid States in the face of 130 unauthorized trades.

Mid States appeals from the court's judgment, asserting that an equitable doctrine cannot bar its recovery of the account in this law action.

We conclude it was error for the court to deny Mid States' recovery on the counterclaim. First, Ellwood did not

raise the doctrine of clean hands in his pleadings or at trial, so he should not benefit by its use. Second, the equitable doctrine of clean hands is not applicable in this law action. The clean hands doctrine stands for the principle that a party may be denied relief in equity based on his inequitable, unfair, dishonest, fraudulent, or deceitful conduct. 27 Am.Jur.2d *Equity* § 136, at 667 (1966). As Professor Dobbs points out in his discussion of clean hands:

> There is no comparable, broad-based doctrine of this sort on the law side. Thus, in theory at least, the plaintiff who is denied an equitable remedy because he has unclean hands, still has his legal remedy, whatever that is. On the other hand, the same conduct that constitutes unclean hands may bar him at law under a defense by another name.

D. Dobbs, *Handbook on the Law of Remedies* § 2.4, at 46 (1973). Thus, the trial court erred in applying the doctrine of clean hands to bar Mid States' recovery.

■ When the customer ratifies unauthorized trades, he becomes responsible for the consequences of those trades. P. Johnson, *Commodities Regulation* § 5.47, at 347–48 (1982). The commodity broker's violation of commission, exchange or inhouse rules has not affected the broker's recovery on its claim for an account deficit where the court finds that the customer ratified the trades or a misrepresentation was not relied upon to the customer's detriment. *See Lincoln Commodity Servs. v. Meade,* 558 F.2d 469, 471–72 (8th Cir.1977); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman,* 593 F.2d 129, 130, 134 (8th Cir.), *cert. denied,* 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979); *J.E. Hoetger & Co. v. Ascencio,* 572 F.Supp. 814, 823 (E.D.Mich.1983). Thus, the trial court should have entered judgment on Mid States' counterclaim in some amount.

We, therefore, reverse the district court judgment on the counterclaim and remand the case to that court for new findings of fact and conclusions of law based on the existing record regarding the appropriate amount of recovery on the counterclaim.

The district court will then enter appropriate judgment thereon.

VI. *Disposition.* In summary, we: (1) affirm the judgment of the district court on the issue of ratification of the unauthorized trading; (2) affirm the judgment against defendant Rosenquist for compensatory and punitive damages arising from his forgery; (3) reverse the district court judgment as to Mid States concerning damages or injury to Ellwood's credit due to the forgery; and (4) reverse the judgment of the district court as to Mid States' counterclaim and remand the case to district court for findings and conclusions as to the appropriate amount for judgment on the counterclaim. All costs on appeal are taxed to plaintiff.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.