# IN THE COURT OF APPEALS OF IOWA

No. 16-0399
Filed June 21, 2017

**DUBUQUE INJECTION SERVICE COMPANY,**
Plaintiff/Counterclaim Defendant-Appellant/Cross-Appellee,

**vs.**

**STEVEN J. KRESS,**
Defendant/Counterclaim Plaintiff-Appellee/Cross-Appellant.
------------------------------------------------------
**DUBUQUE INJECTION SERVICE COMPANY,**
Plaintiff,

**vs.**

**BK DIESEL SERVICE, INC.**
Defendant/Cross-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Ackley,

Judge.


Dubuque Injection Service Company (DIS) appeals, and Steven Kress

cross-appeals the outcome of a jury trial on claims by DIS for breach of fiduciary

duty, misappropriation of trade secrets, and interference with business

relationships and on Steven's counterclaim for unpaid wages. **AFFIRMED ON**

**APPEAL AND ON CROSS-APPEAL.**


Paul D. Gamez, Kevin J. Visser, and Abbe M. Stensland of Simmons

Perrine Moyer Bergman P.L.C., Cedar Rapids, for appellant.

Richard K. Whitty, Peter D. Arling, and McKenzie R. Hill of O'Connor & Thomas, P.C., Dubuque, for appellee.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, Chief Judge.**

Dubuque Injection Service Company (DIS) appeals the district court's denial of its motion for new trial following a jury verdict finding Steven Kress—a shareholder of DIS—not liable for breach of fiduciary duty, and finding Steven[1] and BK Diesel Service, Inc. (BK) not liable for misappropriation of trade secrets and interference with business relationships. DIS asserts a new trial should be granted because the district court erred in (1) allowing admission of evidence regarding two non-parties' personal bankruptcy, (2) instructing the jury on the ratification defense, and (3) refusing to allow the admission of protective orders regarding trade secrets into evidence. Steven cross-appeals on the basis of an evidentiary ruling affecting Steven's counterclaim against DIS for unpaid wages. We conclude none of the claims raised by the parties on appeal and cross-appeal warrant reversal or a new trial and therefore affirm.

### I. Background Facts & Proceedings.

DIS was formed in 1987 by Steven, Doug Hefel, and Randy Hefel after Steven approached Doug with the idea of purchasing a local diesel injection repair company. Randy was appointed president of DIS, Doug vice president, and Steven secretary and treasurer. Steven, Doug, and Randy are the only shareholders of DIS, each owning a one-third interest.

Steven had some previous knowledge of the trade, and it was the understanding of the parties at the outset Steven would run the business. Doug was involved for the first year helping to gain attention for the business, but

---

[1] Because there are individuals relative to this matter sharing the same last name, all parties will be referred to by their first name.

subsequently had minimal involvement. Randy, who has an education in accounting, set up the books for DIS and did the bookkeeping for a period of time. However, Randy's day-to-day involvement in DIS stopped between 1990 and about 2008, when Randy again began working regularly at DIS. Steven completed training in the diesel-fuel-injection trade and managed the business and the on-site shop. Steven worked long hours, opening and closing the shop each day. DIS was able to get off its feet and eventually excelled. A distribution was first made to each of the shareholders in 1996. Throughout the years, the shareholders each received distributions totaling approximately $370,000.

In the early years of the company, Steven was paid a salary of approximately $20,000 or $30,000 a year. By 1990 Steven's salary had risen to $54,500. Steven's salary steadily increased between 2000 and 2010—his tax return reflecting an income of $499,950 in 2010. Steven conceded he was in charge of payroll for the company, but asserted in 2006 Randy told Steven to begin taking his salary in one or two lump sums, leaving $100,000 to $150,000 in the DIS bank account. Doug and Randy maintained they were unaware of the amount of Steven's salary.

The record also reflects Steven purchased personal items through DIS, including vehicles in 2005, 2007, and 2010; the gas for Steven's home; Steven's cell phone service; vehicle parts; a gun safe; and other items. Members of Steven's family were added to the DIS payroll although, except for Steven's son, they did not work there. Steven stated Randy told him in order to save taxes he should make purchases through DIS from money that he would have been paid in salary. Steven also stated Randy told him to include his family members on

the payroll, also to save tax money. Doug and Randy claimed they did not know about the personal purchases or the family members on the DIS payroll. However, the personal purchases made and the addition of Steven's family members to the payroll were documented and reflected in the DIS business records, as was Steven's yearly salary.

A bookkeeping mistake caused Steven to take too much money for his salary in 2010, resulting in a loss to DIS for the year. Doug and Randy called a shareholder meeting for December 12, 2011. At the meeting, Doug and Randy voted to remove Steven as a director and officer of DIS but asked that he continue managing the company. Also at the meeting, Doug and Randy offered to sell their shares to Steven for $400,000 each.

Steven testified that on December 12, 2011, he requested the bookkeeper issue a check to the Internal Revenue Service in the amount of $100,000 to cover his anticipated 2011 tax liability.[2] Randy later directed the bookkeeper to reverse the payment.

Doug and his wife filed for bankruptcy in October 2010. After the December 12, 2011 meeting, Steven learned Doug had substantially undervalued his shares in DIS in the bankruptcy proceedings, despite demanding $400,000 from Steven for the shares. Steven also learned Doug had taken out an individual loan in the amount of $170,000 and signed a personal guaranty for $400,000 for one of his other companies.

---

[2] It is disputed whether Steven's request to issue the check was made before the December 12 shareholder meeting.

Based on this knowledge, Steven claimed he felt he could no longer trust Doug and Randy. Therefore, Steven removed an amount of DIS business records from the company building and took them to his home to protect his interest and to prevent the records from being altered. Steven also claimed he no longer wanted to rent the DIS shop space from Randy, so he met with a commercial lender to inquire about obtaining a loan for a new building. During the meeting, Steven provided both personal and DIS financial information to the lender.

On the night of January 3, 2012, Randy called Steven to obtain the company's Quick Books software password. Steven refused, and instead told Randy to meet him at the DIS building the next day to review any Quick Books records. The next morning Randy met Steven and his son in the DIS parking lot and informed them they were both on unpaid leave.

On January 5, 2012, Steven made a counteroffer to purchase Doug and Randy's DIS shares for a total of $400,000, which they rejected. In March 2012, Steven purchased a new building and, in June 2012, Steven and his business partner, Mike Boge, opened BK. Between March and June, DIS filed this lawsuit against Steven. The lawsuit was later consolidated with a February 27, 2014 lawsuit filed by DIS against BK.

The jury trial began on June 23, 2015. The jury returned its verdict on July 2, 2015, denying all claims by DIS and denying Steven's counterclaim. DIS now appeals and Steven cross-appeals.

**II. Standard of Review.**

We review evidentiary rulings for an abuse of discretion. *Hall v. Jennie Edmundson Mem'l Hosp.*, 812 N.W.2d 681, 685 (Iowa 2012). "An abuse of discretion exists when the court exercises its discretion on 'grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Heinz v. Heinz*, 653 N.W.2d 334, 338 (Iowa 2002) (citation omitted).

We review challenges to jury instructions given by the district court for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016); *see also State v. Schuler*, 774 N.W.2d 294, 297 (Iowa 2009) ("We review jury instructions to decide if they are correct statements of the law and are supported by substantial evidence." (citation omitted)).

**III. Analysis.**

DIS contends a new trial is warranted because the trial court improperly allowed evidence of Doug's personal bankruptcy to be admitted at trial, instructed the jury on the ratification defense, and did not allow admission of previously-filed protective orders regarding trade secrets. Steven asserts a new trial is warranted on his counterclaim because the trial court improperly allowed admission of a DIS audit-trail document.

**A. Bankruptcy.**

DIS challenges the district court's decision to allow evidence regarding Doug and his wife's personal bankruptcy to be admitted at trial. Steven asserts error is not fully preserved on this issue because counsel for DIS did not make proper objections during all the instances the bankruptcy evidence was discussed in testimony.

"To preserve error for appellate review, a party must alert the district court to the issue at a time when the district court can take corrective action." *Schmitt v. Koehring Cranes, Inc.*, 798 N.W.2d 491, 496 (Iowa Ct. App. 2011). "Additionally, the grounds of the objection must be specifically stated to inform the trial court of the basis for the complaint." *Id.* at 501.

DIS contends it preserved error by its motion in limine, objections, or both. The motion in limine attempted to exclude any mention of the personal bankruptcy of Doug Hefel and his spouse and the associated proceedings, as well as any criminal investigation and civil proceedings currently pending and related to the bankruptcy proceedings. With respect to the preservation of error by a motion in limine, our supreme court recited the applicable principles in *Quad City Bank & Trust v. Jim Kircher & Associates, P.C.*, 804 N.W.2d 83, 89–90 (Iowa 2011):

> A ruling sustaining a motion in limine is generally not an evidentiary ruling. *Twyford v. Weber*, 220 N.W.2d 919, 923 (Iowa 1974). Rather, a ruling sustaining a motion in limine simply adds a procedural step to the introduction of allegedly objectionable evidence. *Id.*; *accord Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 317 (Iowa 1992) (recognizing a ruling sustaining a motion in limine "merely adds a procedural step to the offer of evidence [and that i]f the evidence is not offered, there is nothing preserved to review on appeal"). Thus, a motion in limine "serves the useful purpose of raising and pointing out before trial certain evidentiary rulings the court may be called upon to make during the course of the trial" and, if sustained, excludes reference or introduction of this evidence until its admissibility is determined by the trial court, outside the presence of a jury, in an offer of proof. *Twyford*, 220 N.W.2d at 922–23 (recognizing further that the offer of proof allows the aggrieved party to present a proper record for review on appeal and, in the absence of such an offer, error may not be preserved).
>
> The abovementioned rules regarding a motion in limine serve as the basis for the rule that "error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial." *State v. Alberts*, 722 N.W.2d

402, 406 (Iowa 2006) (quoting *State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000)) (internal quotation marks omitted); *accord Simkins v. City of Davenport*, 232 N.W.2d 561, 565 (Iowa 1975). This is because the error only occurs, if at all, when the evidence is offered at trial and is either admitted or refused. *State v. Langley*, 265 N.W.2d 718, 720 (Iowa 1978) (recognizing further, normally "the ruling is not a final one; it is a red flag to counsel that the evidence is not to be brought before the jury unless and until it is separately taken up with the court . . . at trial"). There is, however, an exception to this general rule. When the court's ruling on a motion in limine leaves no question that the challenged evidence will or will not be admitted at trial, counsel need not renew its objection to the evidence at trial to preserve error. *Alberts*, 722 N.W.2d at 406; *State v. Miller*, 229 N.W.2d 762, 768 (Iowa 1975). "In such a situation, the decision on the motion has the effect of [an evidentiary] ruling." *Tangie*, 616 N.W.2d at 569 (quoting *Miller*, 229 N.W.2d at 768) (internal quotation marks omitted).

The key to deciding whether the general rule or the exception applies in a given case is determining what the trial court purported to do in its ruling. *Alberts*, 722 N.W.2d at 406. As we have recognized:

> "A ruling only granting or denying protection from prejudicial references to challenged evidence cannot preserve the inadmissibility issue for appellate review." However, "if the ruling reaches the ultimate issue [of admissibility] and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial [to preserve error]."

*Id.* (quoting State v. O'Connell, 275 N.W.2d 197, 202 (Iowa 1979)). Compare *State v. Daly*, 623 N.W.2d 799, 800 (Iowa 2001) (holding that an exception to the general rule applied when counsel asked the court whether its ruling was the final order of the court and the court responded, "yes"), *with Johnson*, 481 N.W.2d at 316–17 (holding the general rule applied, and error was not preserved, when the court's ruling merely prohibited a party from mentioning the challenged evidence without first obtaining permission from the court outside the presence of the jury). Accordingly, . . . we first must determine the intent of the district court ruling on [the movant's] motion in limine.

Here, the district court's ruling or position evolved as the hearing progressed. Unfortunately, we do not have a written order in limine that could clearly define the limits of admissibility and provide aid to counsel to preserve

error. In the absence of a written order, we have closely examined the official transcript of the hearing. From our examination of that record, we conclude the district court unambiguously partially overruled the motion and determined any evidence that one of the owners of DIS, Douglas Hefel, had filed bankruptcy, had received a bankruptcy discharge, and had the discharge revoked was admissible. The motion was also unambiguously overruled to the extent Steven could testify someone told him not to talk to the bankruptcy trustee if contacted, and Steven knew Doug had substantially undervalued his share in the company. On these issues the motion in limine was "resolved in such a way it [was] beyond question whether or not the challenged evidence [would] be admitted during trial," and counsel for DIS was not required to make specific objections to the evidence as it was presented. *Tangie*, 616 N.W.2d at 569 (citation omitted).

The motion in limine was sustained to the extent no reference was to be made relative to Doug's bankruptcy schedules, the specific reason why the bankruptcy discharge was revoked, or any evidence of a federal indictment.

The court also indicated Steven could testify in a limited fashion that Steven did what he did because of his perceptions of this knowledge. However, the court—on two occasions—indicated it would have to "hear how the story is laid out" and "I don't know exactly how all of this would be presented, so I am going to have to see it as it develops." The court even indicated the questions on this topic "are going to have to be very narrow and then they're going to be subject to, I assume, a great deal of objection."

DIS has not recited the disputed evidence as it came in during the trial, and as best as we can determine, the following portions of testimony are the extent of such evidence.

(1) During Steven's testimony on cross-examination by Steven's counsel:

> Q. . . .  In 2010, did you come to learn that your fellow shareholder, Douglas Hefel, had filed for bankruptcy protection?
> . . . .
> A. Yes.

Counsel for DIS objected to this testimony on the basis of hearsay.

(2) Also on Steven's testimony on cross-examination:

> Q. During his bankruptcy, did he ever talk to you about a problem that he was having with a creditor known as Dutrac Community Credit Union?
> . . . .
> A. I did talk to Doug about the problems he was having with Dutrac Community Credit Union.

Counsel for DIS objected to this testimony on the basis of relevance.

(3) On direct examination of Doug's wife:

> Q. There has been some testimony that you and your husband took bankruptcy.  Do you recall the date on which you did that?  A. Yes.
> Q. What was it?  A. October 8th, 2010.

No objection was made to this testimony.

(4) Randy's testimony:

> Q. Did you ever have a conversation with Mr. Kress about what he should say or do if the trustee in bankruptcy for Doug and Sheila Hefel ever called about interest in purchasing Doug's shares?  A. No.  I didn't.

No objection was made to this testimony.

(5) On direct examination of Steven by Steven's counsel:

Q. After Doug Hefel filed for bankruptcy, did Randy Hefel ever give you instructions about what to do if the bankruptcy trustee called?

COUNSEL FOR DIS: Objection, Your Honor. I believe that exceeds the scope of the Court's previous ruling.

THE COURT: No, it does not. Overruled. You may answer.

A. Yes, he did.

Q. What did he tell you? A. He told me that if the bankruptcy trustee called, that we don't have to talk to them, and nobody is interested in buying Doug Hefel's shares.

Counsel for DIS made an objection in the middle of this line of questioning asserting the question called for information falling outside the bounds of the court's ruling on the motion in limine.

And although not evidence, in Steven's counsel's closing argument the following reference to bankruptcy was made:

Why did they do this? And the answer, I would submit to you, is because Doug Hefel needed some money. He was out of bankruptcy. We talked about the $170,000.00 he borrowed, in August of 2011, and then signed a personal guarant[y] on a $400,000.00 indebtedness for one of his companies as well. It was time to cash out of Dubuque Injection. Doug needed the money.

No objection or motion for mistrial was made with respect to this statement.[3]

DIS's motion in limine clearly asked that all evidence of Doug's bankruptcy and the related legal proceedings be excluded. We conclude DIS preserved

---

[3] Our supreme court has explained:

It is not always essential that opposing counsel interrupt closing argument with an objection:

"Where closing arguments are reported, certified and made a part of the record, objections to remarks of counsel during final argument are timely if urged at close of argument and in a motion for mistrial made before submission to the jury."

*State v. Nelson*, 234 N.W.2d 368, 371 (Iowa 1975). Here the arguments were not reported and no objection appears of record before the case was submitted to the jury.

*State v. Romeo*, 542 N.W.2d 543, 552 n.5 (Iowa 1996).

error by its motion because the court unambiguously stated some limited and specifically delineated evidence of the bankruptcy and related proceedings could be admitted. DIS now challenges the bankruptcy evidence on appeal on the basis of relevance and unfair prejudice.

DIS contends the district court abused its discretion in allowing admission of this evidence because it was irrelevant to any elements of the claims alleged and was unfairly prejudicial.

"Evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) (quoting Iowa R. Evid. 5.401). "The test is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.'" *Id.* (citations omitted).

Steven asserts the bankruptcy evidence was relevant because it helped to explain his conduct in removing DIS business records from the shop and seeking a loan to purchase a new building. Steven maintains he did not trust Doug and Randy after he learned of the bankruptcy, he discovered Doug substantially undervalued the value of his DIS shares, and he was instructed what to say to the bankruptcy trustee. Steven argues his actions were the result of his mistrust.

In its ruling on the motion for new trial, the district court explained:

The information that was offered pertaining to the discussions had between the three-member partnership was presented solely to explain the actions of the Defendant Kress. The claim brought against him was fraud, inter alia, and the Court deemed it

appropriate to allow him the ability to defend himself by asserting reasons for his conduct.

DIS argues the bankruptcy evidence was admitted at trial with the intent to reveal an improper motive behind filing the lawsuit—that Doug needed money. Steven's counsel's statements in closing argument appear to reflect this intent: "Why did they do this? And the answer, I would submit to you, is because Doug Hefel needed some money." However, no objection or motion for mistrial was made following Steven's counsel's closing argument. Additionally, the bankruptcy evidence as it was elicited during testimony was directed toward proving a motivation behind Steven's conduct, not a motivation by DIS for filing the lawsuit. To the extent this evidence was used for a different purpose in closing arguments, DIS should have objected.

We acknowledge Doug and his wife are not parties to this case, and there is only marginal relevance to the bankruptcy evidence admitted at trial. However, Steven's defense depended on his ability to explain the intent behind his actions. For example, Steven was alleged to have misappropriated DIS trade secrets, requiring a showing that the information was acquired by "improper means." *See* Iowa Code § 550.2 (2011). Steven argued he did not use improper means to acquire the DIS business information, and instead intended to protect his interest and the interest of the business. The limited bankruptcy evidence in this case was relevant to explain Steven's conduct. This is not to say non-party bankruptcy evidence will generally be relevant in most cases. *See White & Johnson, P.C. v. Bayne*, No. 02-0757, 2003 WL 21696938, at *3 (Iowa Ct. App.

July 23, 2003) (finding the district court did not abuse its discretion in refusing to allow evidence of bankruptcy).

Although relevant, the court may exclude "evidence if its probative value is substantially outweighed by . . . unfair prejudice." Iowa R. Evid. 5.403. "'Unfair prejudice' is an undue tendency to suggest decisions by the fact finder based on an improper basis, often an emotional one." *State v. Brown*, 569 N.W.2d 113, 117 (Iowa 1997).

As explained by the district court in its ruling on the motion for new trial, the court took great care to limit the evidence to avoid unfair prejudice:

> The court made it perfectly clear that the evidence was to be very limited. It was to be presented in the manner as intended, to wit: to support [Steven]'s contention that [he] attempted to take financial steps to protect his interests in [DIS] in light of the knowledge he had pertaining to the bankruptcy filing.
> . . . The court did not allow any specificity to be presented to the jury as to the details of these discussions. Additionally, the court did not allow any information pertaining to the specificity of the fraud committed by the Hefels before the bankruptcy court.

Indeed, the bankruptcy evidence admitted at trial was minimal and there was no evidence admitted concerning the revocation of the bankruptcy discharge. Further, even if the jury believed the reasons Steven provided for his loss of trust of the other two owners, which included the bankruptcy-related evidence, DIS had ample opportunity to argue this would only explain why Steven removed the records from the business to protect his interests. DIS was not prejudiced because DIS had the full opportunity to argue the removal of the records did not explain why Steven violated his fiduciary duty by sharing the records with his banker, or how Steven used the records to steal trade secrets and start his own business. However, according to the jury's answers to the

special interrogatories, DIS failed to even establish there were trade secrets in the business.

On this record, we cannot say the minimal bankruptcy evidence caused the jury to reach its verdict on an improper basis. We conclude the bankruptcy evidence admitted and preserved for our review did not unfairly prejudice DIS. Thus, we find the district court did not abuse its discretion in allowing admission of the bankruptcy evidence.[4]

Additionally, the jury was properly instructed on the elements to be considered for each claim, and the jury is presumed to have obeyed the instructions. *See State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010). One of the elements in the marshalling instructions for each of the claims by DIS required the jury to determine if there was damage caused to DIS. The jury may have concluded there was no damage to DIS, and thus no breach of a fiduciary duty, because for all intents and purposes, Steven developed this business from the ground up over the course of twenty-five years with little or no help from Doug and Randy, and Doug and Randy were still left with a business and assets worth more than their efforts may have warranted. Under these facts, we cannot say the jury did not effectuate substantial justice or the substantial rights of DIS were affected so as to warrant a reversal and new trial. *See Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000); c*f. Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 641 (Iowa 1997).

---

[4] Steven asserted a claim on cross-appeal contingent on our granting a new trial based on the bankruptcy evidence admitted at trial. Because we do not find a new trial is warranted on the grounds of the bankruptcy evidence, we need not address Steven's corresponding claim on cross-appeal.

**B. Ratification Defense.**

Next, DIS asserts the district court erred in instructing the jury on the ratification defense. DIS contends the ratification defense cannot be raised to justify intentional misconduct, the knowledge of Doug and Randy cannot be imputed to DIS, and the ratification defense is factually inapplicable because Steven presented no evidence supporting ratification after the alleged acts occurred.

In reviewing the court's submission of a jury instruction for correction of errors at law,

> we view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury. If substantial evidence in the record supports each element of a claim, the motion for directed verdict must be overruled. When reasonable minds would accept the evidence as adequate to reach the same findings, evidence is substantial. On appeal our role is to determine whether the trial court correctly determined there was sufficient evidence to submit the issue to the jury.

*Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008) (internal citations omitted). "Any error in the instructions given 'does not merit reversal unless it results in prejudice.'"[5]  *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (citation omitted).

---

[5] Steven argues even if there was an error in submitting the ratification instruction to the jury, there was no prejudice because the jury did not reach the issue of ratification. However, there was no direct question on the special interrogatories and verdict form addressing ratification to indicate whether the jury did or did not reach the issue. Thus, it

"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1975) (citation omitted). "The basic elements of ratification are (1) the presence of a principal; (2) an act conducted by an agent; (3) knowledge of material facts by the principal; and (4) the principal's intent, either express or implied, to ratify the agent's act." *King v. Gustafson*, 459 N.W.2d 651, 653–54 (Iowa Ct. App. 1990).

The ratification instruction provided to the jury stated:

> Ratification is established by a showing of:
> 1. Acceptance by the principal of the benefits of the agent's act,
> 2. with full knowledge of the facts, and
> 3. circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement.
> Silence when one would be expected to speak may be held a failure to repudiate. Failure to repudiate an unauthorized action within a reasonable time after learning of the transaction will be deemed a ratification.
> Ratification can only be effective between the parties involved when the act is done openly and admittedly for the principal and not when done for personal or third party's benefit.

For the proposition the ratification defense is not available to defend against allegations of intentional misconduct, DIS cites *Wycoff, Seaman & Benedict v. Davis*, 103 N.W. 348 (Iowa 1905), and *Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37 (Iowa 1979). However, rather than directly stating intentional misconduct cannot be ratified, the cited cases more directly stand for the

---

is more likely the jury would have considered ratification in determining whether Steven was liable for any of the claims alleged.

established proposition that actions taken by an individual on their own behalf cannot be ratified. *See Anita Valley, Inc.*, 279 N.W.2d at 42 (holding the ratification defense would not apply where the defendant acted "solely on his own behalf"); *Wycoff*, 103 N.W. at 350 ("The doctrine of ratification has no application to such state of facts, for there is nothing to ratify; nothing was done on the company's behalf or in its name; the transaction was in the name of [the defendant] and for his individual benefit.").

Oppositely, Steven asserts Iowa case law indicates the ratification defense *may* be used with respect to intentional misconduct, citing *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174 (Iowa 1987). In *Ellwood*, our supreme court upheld the district court's application of the ratification defense with respect to claims of negligence, conversion, and fraud. 404 N.W.2d at 179. The court found the ratification instruction was properly given where the plaintiff "was enough of a sophisticated investor to know that [the defendant] was trading illegally on his account" and did not act to end the unauthorized trading. *Id.* at 181. We do not find adequate support for the contention intentional misconduct cannot be ratified as a bright-line rule. Additionally, it is notable the ratification instruction in this case correctly informed the jury "[r]atificaiton can only be effective between the parties involved when the act is done openly and admittedly for the principal and not when done for personal or third party's benefit."

Our case law also belies the assertion by DIS that Doug's and Randy's knowledge cannot be imputed to DIS. "As a general proposition knowledge or notice of an officer-director of a corporation is imputed to the corporate entity

even if it is never actually disclosed to the corporation." *Regal Ins. Co. v. Summit Guar. Corp.*, 324 N.W.2d 697, 703-04 (Iowa 1982). The exception that "[n]otice to an officer or director is not imputed to the corporate entity where the officer is acting in conflict with or to the detriment of the corporation" does not apply in this case because Doug and Randy are not to alleged to have acted in conflict with or to the detriment of the company. *See id.* at 704.

Last, the record reflects Steven did present evidence to show DIS ratified Steven's actions after they were carried out. Ratification does not have to occur in advance of the act in all cases. *See Pillsbury Co. v. Ward.*, 250 N.W.2d 35, 39 (Iowa 1977) ("A failure to repudiate the unauthorized act of an agent within a reasonable time after learning thereof will be deemed a ratification."). Steven presented evidence to show Doug and Randy did not take steps to repudiate his allegedly unauthorized actions. Steven produced exhibits at trial that indicated his salary and his family members' salaries were recorded in DIS business records. Additionally, with respect to Steven's salary, Randy testified:

> Q. [W]ould you tell the jury what the wages were for Mr. Kress in 2007, the year about which you did not object? A. 200— $214,232.00.
> Q. And you thought that was an acceptable wage, correct? A. I don't know. At the time, I'm not sure. I don't remember.
> A. Well, you looked at the 2007 tax return, and you didn't have a problem with his salary. Isn't that what you just talked about, Mr. Hefel? A. Yes.

Randy also testified regarding Steven's purchase of vehicles through DIS:

> Q. Okay. The pick-up that was purchased through the company in 2005, you were aware . . . it had been purchased by the company, correct? A. Yes.
> . . . .
> Q. When you found out Mr. Kress had bought the pick-up though the company, did you object? A. No, I didn't.

Q. And you saw him then later driving another pick-up in 2007, correct? A. Yes.

Q. Did you know that it had been purchased by the company? A. Not directly, but I just expected that he probably did it, since he said the first one, the first one, I would expect he probably bought the second one through the company.

Q. Did you voice any objection? A. No, I didn't.

Q. How about the 2010 pick-up? Did you know that had been purchased through the company? A. The same thing. I would have expected it.

And with respect to Steven's salary, Doug testified:

Q. [W]ho were the officers of [DIS]? A. I believe it was myself, um, Steve and Randy.

Q. All right. And you knew you had not been paid any officer compensation in 2009, by [DIS], correct? A. Correct.

Q. So that narrowed it down to either Randy or Steve, or a combination, got paid $392,000.00 that year, right? A. I would assume, yes.

Q. All right. After that—after learning that, did [you] ever go to Randy and say, who earned $392,500.00 in 2009? A. I never had no discussion.

Q. Did you ever go to Steve Kress and say, Hey, officers got paid $392,000.00. What's going on? A. I never had no discussion, no.

Viewing the evidence in the light most favorable to Steven, we conclude sufficient evidence supports the ratification instruction, and we find the district court did not err in instructing the jury on the ratification defense.

**C. Admissibility of Protective Orders Regarding Trade Secrets.**

Last, DIS asserts the district court abused its discretion in failing to allow into evidence protective orders regarding trade secrets. The protective orders—exhibits 212 and 213—were issued to protect "[a]ll documents produced relating to [BK]"[6] and to restrict information designated confidential by any of the parties.

---

[6] The Exhibit 212 protective order with respect to BK information was sought and obtained by Mike Boge before BK was a party to this lawsuit.

DIS maintains the fact Steven and BK sought to protect this information via the protective orders reveals similar DIS information disclosed by Steven to the commercial lender included trade secrets. DIS asserts the district court abused its discretion in refusing to admit exhibits 212 and 213 because the exhibits were relevant to a critical issue of fact regarding the misappropriation-of-trade-secrets claim.

The district court held:

My intention in entering those orders is to keep the community from being able to review those certain and specific things. . . . Just simply by the court entering that order, I don't intend to make any findings as to what's being intended to be confidential between the parties, confidential as to trade secrets, so I'm not sure exactly what you want it to do for purposes of the jury. If it's intended to intimate any of those things, I won't allow it to do that.
. . . .
. . . The court is not here to establish by way of entry of that order that there is something that needs to be protected. That's what I want to avoid. I am only sitting here, as the referee, to call balls and strikes. I'm not here to argue the case, to let them know that I deem that to be an important document, and I mean, I, meaning the black robe.
So I don't want that document to put any elevated weight in either corner, or take away from either corner. So I guess my conclusion is 213 and 212 don't go to the jury.

We cannot find such a conclusion by the district court constituted an abuse of discretion. The language of each of the protective orders was somewhat vague in defining the protected information, and it is not clear the information protected in the orders was the same as the DIS information disclosed by Steven. The Exhibit 212 protective order, filed December 21, 2012, was not signed by Steven or his attorney. Thus, its contents would not be probative to the claims against Steven. The Exhibit 213 protective order, filed May 6, 2014, was signed by Steven's attorney, but this protective order did not

identify any particular confidential records or materials that may be trade secrets. Rather, it provided a method whereby each party could mark pleadings, depositions, and records filed with the clerk as "confidential pursuant to protective order." Thus, the order itself is only marginally relevant to reflect that certain documents were, or may be confidential, without any reference to the specific documents that might include trade secrets.

Also, the refusal to allow admission of the exhibits in question did not foreclose the opportunity for DIS to show the disclosed information contained trade secrets through the presentation of other evidence at trial. The district court reasoned that admission of the protective orders would unfairly place the weight of judicial affirmance behind the claim the disclosed information contained trade secrets, although the protective orders did not make such a finding. Such reasoning is not clearly untenable or unreasonable. Therefore, we conclude the court did not abuse its discretion in refusing to admit the exhibits.

### D. Cross-Appeal.

On cross-appeal, Steven contends the district court erred in allowing admission of Exhibit 232, a DIS audit-trail document.[7] Steven asserts DIS failed to lay the proper foundation for admission of the exhibit as a business record under Iowa Rule of Evidence 5.803(6).

Rule 5.803(6) provides an exception for hearsay for:

A record of an act, event, condition, opinion, or diagnosis if:

_____

[7] It appears DIS counsel's purpose in seeking to admit Exhibit 232 was to show Steven authorized payments, including the $100,000 check to the IRS, after his authority to do so had been revoked by his removal as a director and officer, thereby indicating Steven was not entitled to $100,000 for unpaid wages as alleged in his counterclaim.

(A) The record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) Making the record was a regular practice of that activity;

(D) All these conditions are shown by the testimony of the custodian or another qualified witness, . . . ; and

(E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

As to Exhibit 232, Steven testified:

Q. Is Exhibit 232 the type of ledger information that is contained in your Quick Books software?  A. I'm not sure.  It says Dubuque Injection on it, but I'm not that familiar with the Quick Books, so—

Q. Okay.  Have you seen printouts like that from your company's general ledger?  A. I don't remember seeing it on the Quick Books.

Q. Okay.  Were you in charge ultimately of the general ledger?  A. I hired bookkeepers who have been in charge of it.

With respect to the foundation for Exhibit 232, the court questioned Steven

further:

THE COURT: With regard to utilization of the Quick Books post-hiring of the last bookkeeper, that was your standard operating system, correct?

STEVEN:  Standard operating system was rebuild, for twenty-five years.

THE COURT: And then this Quick Books went on it?

STEVEN: And then this last secretary that I hired, she put Quick Books in to take all of the accounting stuff out of rebuild, and then we put it into a Quick Books to make it easier for her to use.  So we never, we never had it until just the last seven, eight months.

THE COURT: Okay.  Overruled.  232 will be in as a business record.  Thank you.

Steven argues there was not proper foundation for admission of Exhibit

232 as a business record because he testified he was not familiar with the Quick

Books printout and did not authorize anyone to backdate the entries as shown on

the printout. Steven also argues admission of Exhibit 232 prejudiced his counterclaim for unpaid wages for the cancelled $100,000 check to the IRS, which was paid on December 14, 2011, but Exhibit 232 reflected it as paid on December 12, 2011.

"A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ." Iowa R. Evid. 5.103(a). "Thus, error in an evidentiary ruling that is harmless may not be a basis for relief on appeal." *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008). "[T]he test is whether the rights of the objecting party have been 'injuriously affected by the error' or whether the party has 'suffered a miscarriage of justice.'" *Id.* (citation omitted).

We conclude Steven was not prejudiced by the admission of Exhibit 232 because other evidence in the record established the $100,000 check to the IRS was not paid prior to Steven's removal as an officer and director on December 12, 2011. *See 6305 SW 9th Street, L.L.C. v. Sons of Geil, L.L.C.*, No. 06-1381, 2007 WL 3376834, at *4 (Iowa Ct. App. Nov. 15, 2007) ("[I]f the erroneously admitted evidence is merely cumulative of other evidence in the record, it is not considered prejudicial." (citing *Vasconez v. Mills*, 651 N.W.2d 48, 57 (Iowa 2002)). Steven himself testified:

> Q. My question is, you know today that that payment of $100,000 wasn't made on December 12th, right? A. That's right. It didn't get done on the 12th.
> Q. Can you give any explanation, then, as to why the company's books would have been amended to shown that the payment was made back on December 12th? A. I wanted it done on the 12th.

Thus, Steven has not shown he was injuriously affected by admission of Exhibit 232 or has suffered a miscarriage of justice. We find the district court did not abuse its discretion in admitting Exhibit 232.

**IV. Conclusion.**

We conclude the district court did not abuse its discretion in allowing admission of limited bankruptcy evidence, and even if inadmissible, a new trial is not required because the substantial rights of DIS were not affected. The district court also did not err in instructing the jury on the ratification defense, and did not abuse its discretion in refusing to allow admission of protective orders at trial. We affirm on appeal. We also affirm on cross-appeal because we conclude the district court did not abuse its discretion in allowing admission of the DIS audit-trail document.

**AFFIRMED ON APPEAL AND ON CROSS-APPEAL.**